**No. 24-4756**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

BILAL ADOM,

*Plaintiff-Appellant*,

v.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 22-cv-07150
Hon. Jeffery S. White

---

# APPELLANT'S OPENING BRIEF

---

Lillian Novak
Amaris Montes
Samuel Weiss
Rights Behind Bars
1800 M Street NW, Front 1 #33821
Washington, DC 20033
202-455-4399
lily@rightsbehindbars.org

*Counsel for Plaintiff-Appellant Bilal Adom*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii
INTRODCUTION ........ 1
JURISDICTIONAL STATEMENT ........ 2
ISSUES PRESENTED ........ 3
STATEMENT OF THE CASE ........ 3
I. Factual Background ........ 3
II. Procedural History ........ 12
SUMMARY OF THE ARGUMENT ........ 14
STANDARD OF REVIEW ........ 15
ARGUMENT ........ 15
I. CDCR WAS NOT ENTITLED TO SUMMARY JUDGMENT ON MR. ADOM'S ADA CLAIM FOR FAILURE TO ACCOMMODATE HIS DISABILITY. ........ 16
A. The record shows that CDCR violated the ADA by arbitrarily terminating Mr. Adom's incontinence supplies and failing to accommodate his incontinence for months. ........ 17
B. The district court misconstrued and misapplied the ADA's meaningful access mandate. ........ 27
C. The district court incorrectly required Mr. Adom to show discriminatory animus ........ 31
D. Provision of adult diapers is a disability accommodation, not medical treatment. ........ 34
E. Mr. Adom's injunctive claims under the ADA are not moot. ........ 37
II. THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE TOWARD MR. ADOM'S NEED FOR EFFECTIVE INCONTINENCE AND CHRONIC PAIN CARE. ........ 39
A. Mr. Adom demonstrated a serious medical need. ........ 40
B. There are triable issues of fact as to whether Dr. Montegrande and Dr. Ladd acted with deliberate indifference to Mr. Adom's serious medical needs. ........ 42
CONCLUSION ........ 49

## TABLE OF AUTHORITIES

### Cases

*Adkins v. Morgan Cnty., Tennessee*, 798 F. App'x 858 (6th Cir. 2020) ................41

*Ali v. Quarterman*, 434 F. App'x 322 (5th Cir. 2011) ..........................................38

*Amyette v. Providence Health Sys.*, 388 F. App'x 606 (9th Cir. 2010)..................18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................15, 43, 44

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010) .............................19

*Banks v. Hayward*, 216 F.3d 1082 (9th Cir. 2000) ................................................42

*Barker v. Osemwingie*, No. 20-15503, 2021 WL 5564625 (9th Cir. Nov. 29, 2021) ...........................................................................................................20, 36

*Baughman v. Walt Disney World Co.*, 685 F.3d 1131 (9th Cir. 2012) ...................27

*Bell v. City of Boise*, 709 F.3d 890 (9th Cir. 2013)................................................38

*Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996)............................................35, 36

*Butler v. WinCo Foods, LLC*, 613 F. App'x 584 (9th Cir. 2015)...........................38

*Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).............................35

*Chapman v. Pier 1 Imports, Inc.*, 631 F.3d 939 (9th Cir. 2011)............................33

*Chen v. Allstate Ins. Co.*, 819 F.3d 1136 (9th Cir. 2016).......................................37

*Cohen v. Culver City*, 754 F.3d 690 (9th Cir. 2014).................................27, 30, 33

*Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014) ..........................................42

*Culver v. Bayola*, MD, No. 18-12968, 2019 WL 3247159 (11th Cir. Feb. 19, 2019) ...............................................................................................................41

*Doty v. Cnty. of Lassen*, 37 F.3d 540 (9th Cir. 1994) ..........................................40

*Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F. Supp. 962 (N.D. Cal.1998)...............33

*Dunsmore v. California*, 854 F. App'x 913 (9th Cir. 2021) ....................................22

*Durham v. Kelley*, 82 F.4th 217 (3d Cir. 2023) .......................................................22

*Duvall v. Cty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) ........................17, 21, 32, 34

*Egberto v. Nevada Dep't of Corr.*, 678 F. App'x 500 (9th Cir. 2017).....................40

*Estelle v. Gamble*, 429 U.S. 97 (1976)...................................................................39

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000) ......37

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) .......................................21

*Hutchinson v. United States*, 838 F.2d 390 (9th Cir. 1988) ....................................42

*Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667 (7th Cir. 2012)................................37

*Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006)..........................................................40

*Lolli v. Cnty. of Orange*, 351 F.3d 410 (9th Cir. 2003)............................................42

*McGary v. City of Portland,* 386 F.3d 1259 (9th Cir. 2004)...................................33

*McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1992) .........................................40, 48

*Morris v. California*, No. 21-16059, 2022 WL 2901730 (9th Cir. 2022)...............36

*Munoz v. Calif. Dep't of Corr. & Rehab.,* 842 F. App'x 59 (9th Cir. 2021) ....................................................................................................24, 25, 35

*O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021) .................................................15

*Pamplin v. Lucas*, No. 22-15284, 2023 WL 3478412 (9th Cir. May 16, 2023) ....36

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) .................................20

*Pierce v. Orange Cnty.*, 526 F.3d 1190 (9th Cir. 2008)...........................................26

*Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850 (9th Cir. 2009) .............................................................................................................19

*Schroeder v. McDonald*, 55 F.3d 454 (9th Cir. 1995) ....................15

*Scott v. Harris*, 550 U.S. 372 (2007)....................28

*Shaw v. Kemper*, 52 F.4th 331 (7th Cir. 2022)....................19

*Shiira v. Hawaii*, 706 F. App'x 436 (9th Cir. 2017) ....................41

*Simmons v. Navajo County*, 609 F.3d 1011 (9th Cir. 2010) ....................35, 36

*Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004) ....................43

*Stewart v. Aranas*, 32 F.4th 1192 (9th Cir. 2022) ....................48

*Taylor v. Franklin Cty.*, 104 F. App'x 531 (6th Cir. 2004)....................41

*Tennessee v. Lane*, 541 U.S. 509 (2004)....................27

*Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010)....................15

*United States v. Georgia*, 546 U.S. 151 (2006)....................20

*Vinson v. Thomas*, 288 F.3d 1145 (9th Cir. 2002) ....................26

*Wilhelm v. Rotman*, 680 F.3d 1113 (9th Cir. 2012) ....................40

**Statutes**

28 U.S.C. § 1291 ....................2

28 U.S.C. § 1331 ....................2

42 U.S.C. § 12101 ....................2

42 U.S.C. § 12102 ....................18

42 U.S.C. § 12132 ....................17, 27

**Rules**

Fed. R. App. P. 4(a)....................2

Fed. R. Civ. P. 56 .......... 15, 28, 44

**Regulations**

28 C.F.R. § 35.108 .......... 18

28 C.F.R. § 35.130(b)(3) .......... 37

**Constitutional Provisions**

U.S. Const. amend. VIII .......... 2

# INTRODCUTION

Bilal Adom is an incarcerated wheelchair-user with incontinence and a history of spinal surgery and stroke. He experiences severe and chronic spinal pain that is exacerbated when he moves, and thus has been designated “mobility-impaired” and uses a wheelchair to move about. He wears adult diapers to accommodate his incontinence.

These diapers are essential to allow Mr. Adom to relieve himself in a dignified manner and without pain. Mr. Adom experiences involuntary urinary and stool emissions, and without access to incontinence supplies, he soils his clothing and wheelchair seat. When these accidents occur at night, he soils his pajamas and bedsheets and wakes lying in urine-soaked fabric. Sitting or lying in the resulting mess and smell is degrading and humiliating. When he soils himself, he is also forced to painfully clean himself, despite his mobility limitations.

This lawsuit concerns prison staff who abruptly and senselessly ceased providing Mr. Adom adult diapers or any other incontinence supplies, ignoring his repeated pleas for their reinstatement for four to five months. This failure to accommodate Mr. Adom’s disabilities resulted in a lack of meaningful access to toileting services and hygiene, in violation of the Americans with Disabilities Act (ADA). Mr. Adom sought to have his access to incontinence supplies reinstated by many different prison medical providers and staff members throughout this period.

He was met with unfounded skepticism toward the veracity of his complaints and deliberate indifference to his serious medical needs.

The district court erred in granting summary judgment to Defendants. The court below made several legal errors in its ADA analysis, including misconstruing and misapplying the ADA's meaningful access standard, improperly requiring Mr. Adom to show discriminatory animus, erroneously interpreting Mr. Adom's diaper use as medical treatment instead of a disability accommodation, and incorrectly concluding that his injunctive claims were moot. Additionally, the district court inappropriately resolved multiple disputed issues of material fact in Defendants' favor in both Mr. Adom's ADA and Eighth Amendment claims, ignoring entirely Mr. Adom's evidence to the contrary. This Court should reverse the district court's grants of summary judgment and remand for further proceedings.

## JURISDICTIONAL STATEMENT

Mr. Adom appeals the district court's grant of summary judgment on June 25, 2024. Mr. Adom brought claims under the Americans with Disabilities Act, 42 U.S.C. § 12101, and the Eighth Amendment of the United States Constitution. U.S. Const. amend. VIII. Thus, the district court had jurisdiction under 28 U.S.C. § 1331. Adom filed a timely notice of appeal on July 22, 2024. ER-256; *see* Fed. R. App. P. 4(a). This Court has jurisdiction over this appeal of the district court's final judgment under 28 U.S.C. § 1291.

## ISSUES PRESENTED

I. Whether the district court erred in holding that there was no genuine dispute of material fact regarding whether CDCR violated the ADA in refusing to provide Mr. Adom with incontinence supplies.

II. Whether the district court erred in holding that there was no genuine dispute of material fact regarding whether Defendant-Appellees acted with deliberate indifference to Mr. Adom's incontinence and chronic and severe spinal pain.

## STATEMENT OF THE CASE[1]

### I. Factual Background

Bilal Adom is a fifty-six-year-old man with numerous disabilities who is incarcerated at Salinas Valley State Prison (SVSP). ER-180; ER-252. Mr. Adom has a spinal condition, for which he previously had surgery. ER-180. He suffers from chronic and severe post-surgical spinal pain that severely limits his mobility. *Id*. He also has asthma, glaucoma, cataracts, and a history of stroke. *Id*. He uses a wheelchair to get around and wears a prison-issued vest that signals that he is mobility impaired. ER-180–81.

[1] These facts are compiled from record evidence that the parties submitted attached to their motions for summary judgment, as well as Mr. Adom's verified complaint and the exhibits attached thereto.

Since 2020, he has also experienced incontinence. ER-180. Mr. Adom explains that he is unable to control his "urinary evacuations," and, on occasion, he also involuntarily evacuates stool. ER-192; ER-237. Beginning around December 2020, Mr. Adom was provided with an accommodation for his incontinence: a weekly supply of fourteen adult diapers. ER-180. In May 2021, a permanent order for incontinence supplies was entered with SVSP's Durable Medical Equipment program. *Id*.; ER-081. Mr. Adom continued receiving his supply of fourteen adult diapers weekly. ER-180–81.

Until August 2021, Mr. Adom lived on SVSP's Alpha Yard. *Id*. Mr. Adom never had a problem receiving his weekly incontinence supplies while housed in Alpha Yard. *Id*. In August 2021, Mr. Adom was transferred to Delta Yard. ER-181. By early September—within a few weeks of being transferred to Delta Yard and before he had ever met with a Delta Yard doctor—Mr. Adom's weekly supply of adult diapers was abruptly and arbitrarily terminated. ER-181–82; ER-231 (explaining that Mr. Adom's supply of diapers was "discontinued upon [his] housing change"); ER-150; ER-079; ER-087 (showing that Mr. Adom's incontinence accommodation was in place on August 20, 2021 and had expired by October 11, 2021).

Mr. Adom spent the following nearly five months living without access to adult diapers or any other incontinence supplies that he could use to adequately

absorb his involuntary evacuations. ER-187–88; ER-233. Mr. Adom explained in a grievance that he "could not function" without his incontinence supplies because, without his diapers, he had "no alternative but to soil himself." ER-233. Mr. Adom experiences incontinence symptoms both during the daytime and at night.[2] ER-096. During the day, in a desperate attempt to avoid "humiliating and dehumanizing" episodes of urinating on himself in his wheelchair, Mr. Adom would wrap his undercarriage in tissues and plastic wrap when available to him. *Id*. At night, he would sometimes fashion makeshift diapers out of "discarded prison material," such as torn up towels. *Id*.; ER-194. He did not always have material to use for these makeshift incontinence protections. ER-194. Without them, he was "left to live in human wa[]st[e]," and to sleep wrapped in a foul-smelling, damp "urine-soiled blanket." ER-187; ER-194.

The lack of incontinence supplies also aggravated Mr. Adom's underlying spinal pain. Because Mr. Adom is wheelchair-bound, it is extremely difficult for him to tend to his soiled clothing and bedding on his own. ER-180; ER-187. When he experienced an episode of incontinence, he frequently awoke at night having soiled

[2] Defendants state that Mr. Adom's incontinence occurs primarily or only at night. *See, e.g.*, ER-231 (SVSP grievance response stating that a medical provider noted that Mr. Adom voiced "complaints of urinary incontinence," "which [he] reported only occurs at night."). Mr. Adom made clear that, though he sometimes emphasized his nighttime symptoms with medical providers because that is when his pain was most exacerbated, he experiences incontinence and requires accommodations during both the day and the night. ER-046.

himself and would have to rise and change his makeshift wrappings and his bedding. ER-187. But to change his wrappings and sheets, he had to move around and bend, in the middle of the night, without assistance. ER-193. This additional movement caused severe spinal pain. *Id.* Mr. Adom felt anxious every night before he went to bed, anticipating that he would soil his bedsheets and then have to fight through extreme pain in the middle of the night. *Id.* This pain and fear led Mr. Adom's mental health "to deteriorate to the point of mental anguish and deep depression." ER-187.

Mr. Adom informed many different prison officers and medical professionals that he was not receiving the incontinence supplies he needed and that, as a result, he was soiling himself. ER-185. He told "several building officers" that he needed to go to the Delta Yard medical unit to retrieve his incontinence supplies, but he was denied permission to visit the clinic. *Id*. He sent a letter requesting intervention to prison administrators. *Id*. He submitted a formal request for diapers and sanitary wipes, or, in the alternative, "towels, trash can liners, [and] medical tape or box tape, to secure the towels and plastic around [his] private areas," to the "Reasonable Accommodations Panel." *Id*.; ER-237. He filed multiple grievances regarding his termination of supplies and various medical professionals' refusal to reinstate them. ER-091–92; ER-096; ER-097; ER-099; ER-233; ER-237; ER-254; ER-255. He informed Dr. Montegrande, Dr. Ladd, and multiple nurses of his incontinence and his need for diapers. ER-183–87.

Mr. Adom first raised his lack of incontinence supplies with a medical provider on September 10, 2024, when he was summoned to Delta Yard's medical unit for an appointment. ER-181. While at medical, Mr. Adom inquired about his incontinence supplies. *Id*. A nurse informed him that she was not assigned to distribute the supplies and he would need to ask someone else. *Id.* Mr. Adom was then called in for an appointment with Defendant Dr. Faye Montegrande, the purpose of which was to "ensure that [the prison complied with] any prescriptions and treatment recommendations" made by an outside ophthalmologist whom Mr. Adom had seen for his glaucoma. ER-138.

Mr. Adom and Dr. Montegrande disagree on the details of the following encounter. Dr. Montegrande submits that Mr. Adom refused to get out of his wheelchair and on to an examination table during their appointment. ER-139. She states that she then performed a "standard extremity strength test and reflex test" while Mr. Adom was in his wheelchair. *Id*. She states that these tests involve "gently pushing against the patient's extended arms and legs" and "gently tapping . . . beneath the patella . . . with a small rubber reflex hammer" *Id*. Dr. Montegrande maintains that Mr. Adom did not complain of pain during the examination, and that he did not seek follow up care for any injuries during the examination. *Id*.

In his verified complaint and a declaration supporting his opposition to summary judgment, Mr. Adom recounts the following, contrary series of events. ER-

182–84; ER-123–24. Mr. Adom denies that he ever refused to get on the examination table during the exam; in fact, he recalls that there was no examination table at all in the room in which Dr. Montegrande saw him. ER-123. Instead, he recounts that the disputed encounter began when Dr. Montegrande began aggressively questioning him about his need for a wheelchair and his history of stroke. ER-182. When Mr. Adom attempted to truthfully answer her questions, she cut him off, stating "there's no need to lie, I'll just check your medical file." *Id*. The doctor then commenced an unannounced, forceful physical examination. *Id*; ER-123. She struck down on Mr. Adom's extended shin with aggressive force, demanding that he resist her, which he physically could not do because of his chronic spinal condition, of which she was fully aware from his medical records. ER-182–83; ER-123; ER-241. This force caused a sharp, stabbing pain along Mr. Adom's spine that radiated down his back into his legs. ER-183; ER-123. The force and pain caused his left leg to collapse, crashing down into the foot pedal of his wheelchair, causing "intense pain" and "abrasions" to his Achilles. ER-183; ER-123. Mr. Adom reports that he audibly winced in pain throughout the exam. ER-183; ER-124.

After the pain subsided, Mr. Adom realized that his boxers, trousers, and wheelchair seat were wet—the force and pain of the examination had made him involuntarily urinate. ER-183; ER-124. Realizing that he had wet himself, he told Dr. Montegrande about his incontinence and asked about getting incontinence

supplies. ER-183; ER-124. Dr. Montegrande ignored this request, instead continuing with her physical exam. ER-183. In examining his upper body, she again applied so much pressure that Mr. Adom could not resist her force, and his arm went slamming into a "sharp, rusted crevice" on the brake handle of his wheelchair, resulting in "intense pain and abrasions" ER-184.

Dr. Montegrande and Mr. Adom agree that during and following this appointment, Dr. Montegrande did not provide Mr. Adom with any treatment or accommodations to address his complaint of incontinence.[3] ER-139; ER-184. Mr. Adom continued to live for months suffering from incontinence without access to adult diapers, soiling his clothing and bed linins, and suffering through pain when he awoke at night and attempted to change his wrappings and bedding. ER-187.

On September 29, 2021, Mr. Adom received a response to one of his grievance requests denying him incontinence supplies. ER-236. Instead of offering incontinence supplies, a prison official wrote that after Mr. Adom soiled his clothing

---

[3] In his Motion for Summary Judgment, Defendant Scott Ladd maintains that Dr. Montegrande prescribed Mr. Adom oxybutynin at their appointment in September 2021. Mr. Adom disputed this fact in his declaration submitted in support of his opposition to Dr. Ladd's motion, ER-044, and Dr. Montegrande's own declaration does not mention prescribing Adom with any medication, ER-138–140. Dr. Ladd's counsel submitted a declaration attached to his reply admitting that he had misinterpreted some of the medical records Mr. Adom submitted and incorrectly concluded that Dr. Montegrande had prescribed oxybutynin, when prescription of this medication is actually only reflected in Dr. Ladd's note, not Dr. Montegrande's. ER-015.

or bedding, unit staff would "provide [him] a shower as soon as safety and security permits" and "ensure any soiled clothing is processed according to biohazard and/or infectious linen bag procedures." *Id.* There is no record evidence that shows Mr. Adom was actually afforded these showers and laundry access. ER-133 (declarations from prison ADA coordinator stating only that Mr. Adom "could" have access to showers). Mr. Adom was also, on just one occasion during the nearly five months he spent without incontinence supplies, provided with three extra towels and three extra pairs of boxer shorts. ER-196. These purported accommodations did little to help Mr. Adom, who continued to soil himself and experience severe pain whenever he had to get up to clean himself. ER-187.

On December 7, 2021, Mr. Adom had a medical appointment with Defendant Dr. Scott Ladd. ER-186. At this appointment, Mr. Adom informed Dr. Ladd that he was not receiving the incontinence supplies he needed. *Id*. Dr. Ladd replied by informing Mr. Adom that "prisoners were malingering their incontinence conditions . . . thereby abusing the prison system and that such abuse was costly." *Id*. Dr. Ladd denied Mr. Adom's request for incontinence supplies. *Id.* When Mr. Adom pleaded with Dr. Ladd to look further into his medical records to locate his prior incontinence supplies order and date of termination, Dr. Ladd said "I think we're done here," and left. ER-045. Though Dr. Ladd prescribed Mr. Adom oxybutynin, a bladder control medication, ER-186, this medication was discontinued after one week. *Id.* Mr.

Adom's incontinence supplies were still not reinstated even after he was taken off this medication. *Id*. There is no evidence that Dr. Ladd took any further action to treat Mr. Adom's incontinence or lessen the impact of his symptoms.

On December 29, 2021, Mr. Adom was seen by Defendant Dr. Lotersztain. ER-187. She discussed his urinary incontinence and performed a prostate examination. *Id*. Mr. Adom maintains that he did not give oral or written consent to this exam. ER-125. Dr. Lotersztain told Mr. Adom that she would reinstate his incontinence supplies on a temporary basis, but he did not receive any supplies for three additional weeks. ER-201; ER-255; *see also* ER-131. During this time, Mr. Adom continued to suffer exacerbated spinal pain and mental anguish. ER-187; ER-201.

Mr. Adom's weekly supply of incontinence supplies was finally reinstated on January 20, 2022, nearly five months after they were abruptly and arbitrarily discontinued. ER-187. As of March 2022, Mr. Adom still had an active order for incontinence supplies, though that order was logged as "temporary," not "permanent." ER-231. Mr. Adom continues to experience incontinence; he was provided with a kidney ultrasound to investigate the cause of his incontinence in May 2023, over a year and half after he began continuously raising this issue, and only after he filed this action. ER-043. To this day, his permanent incontinence supplies order has not been reinstated.

## II. Procedural History

On November 15, 2022, Mr. Adom filed a verified complaint against CDCR and various individual actors, alleging violations of the ADA and the Eighth Amendment in the District Court for the Northern District of California. ER-173–210. He attached copies of relevant grievances, requests for accommodations, and medical records to the complaint. ER-211–54. On March 1, 2023, the district court entered a screening order dismissing Mr. Adom's claims against one defendant, nurse Bianca Rubio, and dismissing his Eighth Amendment claims against the institutional defendant, California Department of Corrections and Rehabilitation ("CDCR"). ER-167–72. The rest of Mr. Adom's claims were allowed to proceed. *Id*.

Defendants filed two motions for summary judgment on September 27, 2023. ER-263. The first motion was filed by Dr. Ladd, and the second was filed by CDCR jointly with all other individual defendants. *Id*. Mr. Adom submitted two oppositions, one to each motion. ER-264; ER-016–129. His handwritten oppositions were scanned into the docket as a single PDF and are both included in a single filing event on the docket.[4] 43. ER-264; ER-016–129.

[4] In its order granting summary judgment, the district court erroneously states that "[i]n his opposition to the present motion, Plaintiff does not address or oppose Defendant CDCR's argument for summary judgment on [his ADA] claim." ER-010–11. This is plainly contradicted by the record. The district court scanned in Mr. Adom's two handwritten briefs, opposing both sets of defendants' motions for

On June 25, 2024, the district court granted summary judgment on Mr. Adom's ADA and Eighth Amendment claims to all defendants. ER-004. The district court held that Mr. Adom had not shown that any individual defendant acted with deliberate indifference when they denied him incontinence supplies. ER-005–09. It further held that Dr. Montegrande did not act with deliberate indifference in her physical examination of Mr. Adom and that Dr. Lotersztain did not violate Mr. Adom's Eighth Amendment rights when she conducted a rectal examination. ER-009–10. The district court went on to grant summary judgment to CDCR on Mr. Adom's ADA claim, holding (1) that because the prison provided some response to Mr. Adom's access complaints, it had not failed to comply with the ADA, (2) that Mr. Adom had not shown that he was denied an accommodation *because* of his disability, and (3) that Mr. Adom complained of receiving disfavored medical attention, not failure to accommodate. ER-012. The district court entered judgment in favor of defendants on June 25, 2024. ER-013 On July 22, 2024, Mr. Adom timely filed a notice of appeal. ER-256.

---

summary judgment, as a single filing event, and the resulting file (at ER-016–129) includes his brief in opposition to CDCR's motion between pages thirty-eight and sixty-two. ER-053–077. Mr. Adom devotes an entire subsection of his brief to address CDCR's opposition to his ADA arguments. ER-071–73. Mr. Adom's opposition to Dr. Ladd's motion, which is included at the beginning of the file does not touch on the ADA. ER-016- 027. But as Mr. Adom brought no ADA claims against Dr. Ladd, only against CDCR, Mr. Adom properly included these arguments only in his second opposition, which the district court may have overlooked.

## SUMMARY OF THE ARGUMENT

I. The district court erred in granting Defendants summary judgment on Mr. Adom's ADA claim. Mr. Adom can show genuine issues of material fact as to both liability under the ADA and deliberate indifference. Further, the district court made four distinct legal errors in its ADA analysis. First, the district court failed to apply this Court and the Supreme Court's definition of "meaningful access." Second, the district court erroneously imposed a deliberate animus requirement when the ADA compels no such showing. Third, the district court incorrectly classed incontinence supplies as a form of medical treatment, not a disability accommodation. Fourth, the district court wrongly held that Mr. Adom's request for injunctive relief under the ADA was moot. When these errors are corrected, it is clear that Mr. Adom's ADA claim is sufficiently supported and should to proceed to trial.

II. The district court erred in granting Dr. Montegrande and Dr. Ladd summary judgment on Mr. Adom's Eighth Amendment claims for deliberate indifference to his serious medical needs. Mr. Adom has multiple concerning medical conditions, including incontinence and chronic spinal pain, that constitute serious medical needs. Dr. Montegrande acted with deliberate indifference toward these needs when she (1) performed a medically unnecessary and painful strength test and

(2) entirely ignored Mr. Adom's reports of incontinence. Dr. Ladd was deliberately indifferent when he (1) denied Mr. Adom care based on reports that other prisoners were "malingering" incontinence symptoms, and (2) took no action to treat Mr. Adom after discontinuing a bladder medication after only one week.

## STANDARD OF REVIEW

This Court reviews summary judgment rulings de novo. *See O'Doan v. Sanford*, 991 F.3d 1027, 1035 (9th Cir. 2021). Courts grant summary judgment if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A sworn complaint is admissible as a sworn affidavit under Rule 56. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995). This Court liberally construes filings and motions submitted by *pro se* prisoners. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

## ARGUMENT

The district court erred when it held that Mr. Adom's evidence could not substantiate his ADA or Eighth Amendment claims. For nearly five months, wheelchair-bound Mr. Adom suffered through daily pain and indignity as he was

denied both incontinence protections and incontinence treatment. The prison's failure to provide him with incontinence supplies, such as adult diapers, impeded his access to toileting and hygiene services for months, forcing Mr. Adom to live in his own waste in violation of the ADA. Separately, medical staff's failure to take any meaningful action to treat his incontinence and associated pain during this time period violates the Eighth Amendment's prohibition of deliberate indifference to incarcerated people's serious medical needs. Because the district court made legal errors and ignored genuine issues of material fact on both of these claims, this Court must reverse and remand for further proceedings.

## I. CDCR WAS NOT ENTITLED TO SUMMARY JUDGMENT ON MR. ADOM'S ADA CLAIM FOR FAILURE TO ACCOMMODATE HIS DISABILITY.

The district court made four fundamental legal errors in evaluating Mr. Adom's ADA claim. First, it deviated from the Supreme Court's and this Court's definition of "meaningful access" under the ADA and ignored record evidence that Mr. Adom lacked meaningful access to both toileting and hygiene services. Second, it required Mr. Adom to show discriminatory animus, when a reasonable accommodation claim does not contain any such requirement. Third, it erroneously construed Mr. Adom's request for incontinence supplies as medical treatment, not a disability accommodation. Fourth, it incorrectly held that Mr. Adom's injunctive claims were moot because Defendants voluntarily offered Mr. Adom a temporary

accommodation after he began taking steps toward filing this lawsuit. Considered under the correct tests and standards, as articulated below, Mr. Adom's case is a textbook example of disability discrimination by failure to accommodate.

### A. The record shows that CDCR violated the ADA by arbitrarily terminating Mr. Adom's incontinence supplies and failing to accommodate his incontinence for months.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A public entity violates Title II when a plaintiff can show that "(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001) (internal quotation marks omitted). When plaintiffs seek damages for an ADA claim, they must also show that defendants acted with deliberate indifference; that is, that defendants knew "that a harm to a federally protected right is substantially likely, and fail[ed] to act upon that the likelihood." *Id*. at 1139.

Mr. Adom provided the district court with evidence that shows triable issues of fact as to each prong of the ADA test for liability and as to deliberate indifference.

His verified complaint and summary judgment evidence substantiate that he is a person with a disability who lacked meaningful access to toileting services and hygiene for nearly five months because of his unaccommodated incontinence. This evidence also shows that Mr. Adom repeatedly made CDCR aware of his lack of access, yet it took no action that addressed his suffering for months.

First, Mr. Adom has shown that he is a qualified individual with a disability. The ADA defines "disability," in relevant part, as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Congress intended this definition to be interpreted broadly. 28 C.F.R. § 35.108(a) (mandating, in keeping with the ADA Amendments Act of 2008 that "[t]he definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."). What is relevant to the qualified individual analysis is not what formal diagnosis the plaintiff has received but instead the resulting limitations. *See* 28 C.F.R. § 35.108(b)(2); *Amyette v. Providence Health Sys.*, 388 F. App'x 606, 607 (9th Cir. 2010) ("Under the ADA, however, 'disability' is a carefully defined term of art, which is measured by reference to limitations on major life activities, not by reference to doctors' past assessments of the plaintiff's condition") (emphasis added).

The district court focused on the fact that Mr. Adom's doctors, during the months at issue in this case, were not able to pinpoint the underlying medical cause

of Mr. Adom's incontinence. ER-008–09, 12. But the exact cause is irrelevant to the ADA analysis. Mr. Adom has multiple, intersecting medical conditions that severely limit multiple major life activities. ER-180 He has a history of spinal surgery and stroke, as well as a chronic pain condition. ER-180; ER-241; ER-250. His chronic pain limits his ability to walk and otherwise move about unassisted, a major life activity. ER-180. And his incontinence limits his ability to control his urine and bowels, also major life activities. *Id.* These facts are sufficient to establish that Mr. Adom is a person with a disability under the ADA. *See Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 858–59 (9th Cir. 2009) ("precedent does not require comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity . . . Rather . . . a plaintiff's testimony may suffice to establish a genuine issue of material fact.") (quotations omitted); *see also Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022) ("Shaw's confinement to a wheelchair and incontinence render him disabled within the meanings of the ADA").

Second, Mr. Adom was denied access to two programs, services or activities within the prison: toileting and hygiene. In the context of prisons, courts have held that the statutory term "programs, services, and activities" includes virtually everything the prison offers, from dining to visitation to educational programming. *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010) ("the

fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication" inside a prison all constitute a public entity's programs or services); *United States v. Georgia*, 546 U.S. 151, 157 (2006) (listing "hygiene" as a prison service covered by the ADA); *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational "activities," medical "services," and educational and vocational "programs"); *see also Barker v. Osemwingie*, No. 20-15503, 2021 WL 5564625, at *1 (9th Cir. Nov. 29, 2021) (recognizing "toileting services" as a service to which the ADA guarantees access).

Mr. Adom provides facts that show that, during the four-plus months that CDCR withheld his incontinence supplies, he had could not meaningfully access toileting or hygiene. He routinely soiled himself, involuntarily relieving himself while clothed and sitting in his wheelchair or sleeping in his bed. ER-187; ER-194; ER-96. And because of his chronic and movement-induced spinal pain, Mr. Adom suffered severe pain when he tried to clean up the resulting mess. ER-187. Thus, without his weekly supply of adult diapers, Mr. Adom completely lacked access to a hygienic and dignified way to relieve himself; he was forced to "live in human wa[]st[e]," plagued by the foul odor of his soiled clothing and environs. ER-194.

Third, Mr. Adom has shown that he lacked access to these accommodations *because of* his disability. To show causation, Mr. Adom must show that it was his

disabilities, not some other factor, that prevented him from accessing toileting and hygiene. *See Duvall,* 260 F.3d at 1135; *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003) (the operative question in ADA causation analysis is whether the defendant "hurt [people with disabilities] by reason of their handicap, rather than hurt them solely by virtue of what they have in common with other people."). But-for Mr. Adom's incontinence, he would have meaningful access to toileting services: he would be able to control his bladder and bowels and could use the provided bathroom facilities. *See* ER-237 (explaining that Mr. Adom "cannot completely control [his] urine" and sometimes … "[his] stool," and that because of this he is "soiling [his] linen"). And but-for his chronic pain disorder, aggravated by movement, he would be able to better maintain his hygiene by easily moving about to clean himself and change his clothing after an incontinence episode. ER-187. These physical impairments, not any characteristic he shares with nondisabled prisoners, are what create his need for incontinence supplies.

Fourth, Mr. Adom's evidence shows triable issues of fact as to CDCR's deliberate indifference to his federally protected disability rights. To show deliberate indifference, a plaintiff must show (1) that "he has alerted the public entity to his need for accommodation" or that "the need for accommodation is obvious" and (2) that defendants failed to adequately respond. *Duvall*, 260 F.3d at 1139. An adequate response requires "a fact-specific investigation to determine what constitutes a

reasonable accommodation," which "give[s] primary consideration to the requests of the individual with disabilities" *Id.* "[A] public entity does not 'act' by proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable." *Id.*

Inaction in the face of knowledge that a particular accommodation is not being provided and that a disabled prisoner lacks access without it is sufficient to show deliberate indifference. *See Dunsmore v. California*, 854 F. App'x 913 (9th Cir. 2021) (explaining that defendants were "deliberately indifferent to [plaintiff's] accommodations requests because they knew of [plaintiff's] need for accommodations, refused to provide reasonable accommodations, [and] encouraged [plaintiff] to use facilities and equipment inconsistent with his accommodations"); *see also Durham v. Kelley*, 82 F.4th 217, 226 (3d Cir. 2023) (explaining that plaintiff "made numerous prison officials aware that he had a cane, needed a cane to walk, and was in severe pain without it" and holding that "[t]his alone was sufficient to allege deliberate indifference.")

Mr. Adom's verified complaint and summary judgment evidence show that he received incontinence supplies without incident for months while he lived in Alpha Yard, was provided with a permanent order for the supplies, and that this order was abruptly and arbitrarily terminated upon a housing transfer. ER-231; ER-137. These materials further show that, for months, he informed virtually every

medical provider and prison staff member that he interacted with of the abrupt termination of his incontinence supplies and his need for reinstated weekly supplies of adult diapers. ECF-180–187; ER-121–126. They responded to his requests by entirely ignoring him or issuing summary, unreasoned, and unsubstantiated denials.

He told Dr. Montegrande that he needed incontinence supplies after urinating on himself *in front of her*, and she failed to respond. ER-124; ER-183. He told Dr. Ladd that he had been without diapers for months and was suffering extreme pain at night when he tried to change his clothing and linens after an accident. ER-045. Dr. Ladd responded by stating that "inmates were malingering their incontinence symptoms" and refused to reinstate Mr. Adom's weekly supply of diapers. ER-045; ER-186; ER-250. When Mr. Adom tried to continue the conversation, the doctor said "I think we're done here," and left. ER-045. Nothing in the record supports this "malingering" claim, nor do Defendants explain why illicitly obtaining diapers is dangerous. Most critically, nothing in the record suggests that anything about wheelchair-bound Mr. Adom indicates that he was malingering, that he has ever done so, or that anyone thought that he was. In fact, his previous medical team in Alpha Yard determined it was appropriate to enter a permanent order for a weekly supply of diapers. ER-079. And Dr. Ladd himself admitted to Mr. Adom that he understood that Mr. Adom "might be different" from the other prisoners who were purportedly "malingering" a need for diapers. ER-045 Even if Defendants had some

record evidence of an overall problem of malingering, Mr. Adom cannot be denied basic accommodations because of the bad acts of others, in which there is no reason to believe he has taken part.

In addition to these communications with doctors, Mr. Adom told his housing unit officers that his incontinence supplies were discontinued. ER-185. He told a nurse. ER-181. He filed multiple grievances and health care request forms informing prison officials that he was incontinent, had no access to diapers, and was soiling himself. ER-91–93; ER-95–97, 99, ER-230–232; ER-236; ER-254–255. Despite this constant advocacy, no one took any steps to reinstate Mr. Adom's access to diapers or provide him with any other accommodations that facilitated meaningful access for over four months.

The prison's abrupt termination of Mr. Adom's accommodation without individualized assessment is nearly identical to the fact pattern in *Munoz v. California Department of Corrections and Rehabilitation*, in which this Court held that defendants acted with deliberate indifference to the plaintiff's federally protected rights under the ADA. 842 F. App'x 59, 62 (9th Cir. 2021). In *Munoz*, a prisoner with knee problems had his low-bunk order (or "low-bunk chrono") reversed by a doctor. *Id.* She took this action even thought she had "never examined Munoz's knees before rescinding his chrono, nor did she conduct a patient interview." Instead, the doctor made the determination based only on the plaintiff's

medical records, which the court points out "were the same records that prior physicians used to grant Munoz's chrono." *Id.* This Court held that, on summary judgment, these facts were sufficient to create a triable question of whether the doctor had acted with deliberate indifference in terminating the chrono.

Mr. Adom's access to incontinence supplies were also terminated without any individualized assessment. Mr. Adom had had stopped receiving diapers on or before September 10, 2021. ER-181; ER-139. The first time that Mr. Adom saw a medical provider in Delta Yard's medical unit was that same day, September 10, 2021, when he met with Dr. Montegrande. ER-181. Though Mr. Adom asked her about accessing his incontinence supplies, ER-123, she did not engage with him on this topic, and maintains that she did not examine or treat him for incontinence. ER-139. Instead, defendants claim that they terminated Mr. Adom's access to incontinence supplies because of an insufficient basis for the accommodation in his medical records. ER-231. Thus, just like in *Munoz*, medical staff terminated Mr. Adom's accommodation before ever examining or interviewing him about his incontinence, and based on the same medical records that the Alpha Yard staff concluded necessitated incontinence supplies. This demonstrates a triable issue of fact on Defendant's deliberate indifference.

In sum, Mr. Adom has included sufficient evidence to show triable facts on both CDCR's liability under the ADA and the prison's deliberate indifference.[5] In granting Defendants summary judgment on Mr. Adom's ADA claim, the district court made three critical legal errors, outlined below. With these errors corrected, it is clear that this Court should reverse the district court's grant of summary judgment.

---

[5] Mr. Adom has also included sufficient evidence to survive summary judgment on reasonableness, a ground that Defendants did not argue below and that the district court never reached. Once a plaintiff meets the elements of the *prima facie* test outlined above, defendants can still escape ADA liability by showing that the accommodation sought is either a fundamental alteration of their program or imposes an undue burden. *Pierce v. Orange Cnty.*, 526 F.3d 1190, 1217 (9th Cir. 2008). But it is Defendants' heavy burden to show that the accommodation is unreasonable, and Defendants here have failed to provide any evidence of unreasonableness. The fact that Mr. Adom received adult diapers both before and after the four-to-five-month period at issue in this lawsuit indicates that provision of these supplies neither fundamentally alters prison toileting and hygiene programs nor presents an undue burden to the prison system. Defendant Ladd proffers evidence that he knew "incontinence supplies to be abused in the prison system" and declined to issue Mr. Adom's diapers on that basis. ER-144. However, Dr. Ladd and other Defendants never explain precisely how this "abuses" occurs, nor do they argue that they believed Mr. Adom in particular was "abusing" this system, or that this purported abuse renders Mr. Adom's requested accommodation unreasonable. At a minimum, the reasonableness of Mr. Adom's request accommodation is a disputed issue of material fact that precludes summary judgment. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) ("[W]hether a particular accommodation is reasonable depends on the individual circumstances of each case and requires a fact-specific, individualized analysis of the disabled individual's circumstances.") (internal quotations omitted).

### B. The district court misconstrued and misapplied the ADA's meaningful access mandate.

Title II of the ADA guarantees people with disabilities meaningful access to covered programs, services, and activities. 42 U.S.C. § 12132. To comply with the ADA, prisons must afford disabled incarcerated people more than bare access to these services: their access must be *meaningful*—on par with the access that nondisabled prisoners enjoy. *Cohen v. Culver City*, 754 F.3d 690, 694–95 (9th Cir. 2014) (explaining that the ADA proscribes "subtle forms of discrimination . . . that interfere with disabled individuals' full and equal enjoyment" of covered programs and services). When a person with a disability can achieve access only by fighting through pain, humiliation, or risk of injury, that access is not meaningful.

The U.S. Supreme Court's paradigmatic Title II case, *Tennessee v. Lane*, illustrates this point. 541 U.S. 509, 513 (2004). *Lane* involved plaintiffs with mobility impairments who had to crawl or be carried up flights of stairs to reach the second floor of a courthouse. *Id.* at 513. No party suggested that the plaintiffs had meaningful access to the courts even though they could physically reach them by risking injury and humiliation. This Court has explicitly rejected a reading of the ADA's meaningful access mandate that requires only bare access or access accompanied by pain and humiliation. *See Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134–35 (9th Cir. 2012) (rejecting defendant's argument that it must only provide "necessary" accommodations as that "would require very few

accommodations indeed. After all, a paraplegic can enter a courthouse by dragging himself up the front steps, so lifts and ramps would not be 'necessary' . . . And no facility would be required to provide wheelchair-accessible doors or bathrooms, because disabled individuals could be carried in litters or on the backs of their friends. That's not the world we live in.").

Mr. Adom did not have meaningful access to toileting and hygiene services. Because Defendants refused to provide Mr. Adom with his incontinence supplies, he was forced to sit or lie in his own waste after soiling himself and his bedding on a consistent basis. ER-187; ER-194. When he did so, he was also forced to painfully move about to clean his bedding and change his clothing, aggravating his condition. *Id*. This humiliating, painful ordeal does not constitute meaningful access.

The district court erred by holding that providing any "accommodation" at all absolved CDCR of their ADA liability. ER-012. ("[F]or the four to five months when he did not receive these [incontinence] supplies, [Defendants] gave him medical attention, tests, incontinence medication, priority shower access, and additional clothing and towels"). In coming to this conclusion, it assumed evidence that was not in the record and failed to read the facts in the light most favorable to Mr. Adom. Fed. R. Civ. P. 56; *Scott v. Harris*, 550 U.S. 372, 378 (2007). First, the court impermissibly inferred that Mr. Adom actually received priority shower access, an assumption that no record evidence substantiates. The only record

evidence that mentions shower access are a grievance response and a declaration from the ADA Coordinator, both of which state that Mr. Adom would be granted shower access when safety permits. ER-236; ER-133. No evidence shows that he actually received this accommodation. Second, none of these alternatives, even if they were all provided, actually facilitates meaningful access to toileting services and hygiene services—which is what the ADA requires. At minimum, there is a genuine dispute of material fact as to whether Mr. Adom had meaningful access, making summary judgment inappropriate.

"Medical attention" and "tests" are not accommodations in this context—the fact that doctors were talking with Mr. Adom about his underlying impairment and investigating its cause during this period is irrelevant. These actions had no impact on Mr. Adom's ability to relieve himself in a dignified manner and maintain his hygiene. Further, the "incontinence medication" that the district court mentions—oxybutynin—was terminated after one week. ER-186 (explaining the Dr. Ladd prescribed oxybutynin on December 7, 2021 and it was discontinued on December 14, 2021). Medical providers did nothing to effectively address Mr. Adom's incontinence symptoms during the remaining four-plus months during which he was deprived diapers.

Even if, as the prison claims, they provided Mr. Adom with other "accommodations"—priority shower access and additional clothing and towels—

Mr. Adom still entirely lacked access to toileting services. Mr. Adom was told that he would be provided post-accident showers when "safety and security" concerns allowed, and he was given three extra towels and three extra pairs of boxer shorts one time over the many months at issue. ER-236; ER-125. Showers and replacement linens are post-hoc solutions. They allow Mr. Adom to clean up his body and environs after an incontinence episode. They do not allow him to relieve himself in a private and dignified manner on par with the toileting services offered to his nondisabled peers. Even with extra linens and shower access, Mr. Adom still had to suffer the humiliation of soiling himself in public and the risk of infection when he was forced to sit or lay in soiled clothing and linens.[6] ER-187. He detailed the degradation, humiliation, and fear of injury he felt throughout his verified complaint and summary judgment evidence. *See* ER-187, ER-193–94; ER-096.

Additionally, the prison's provision of shower access and additional clothing or linens did not provide *meaningful* access to hygiene. The shower access CDCR claims to have made available to Mr. Adom was conditional and, if it was even provided, it would have only allowed Mr. Adom to maintain hygiene by suffering

[6] Defendants fixated below on the fact that Mr. Adom never in fact suffered an infection stemming from his incontinence. But facing the *risk* of injury due to a lack of accommodation is sufficient under the ADA to show a lack of meaningful access. *Cohen*, 754 F.3d at 700 (explaining that having to contend with risk of injury while navigating inaccessible program and services "is precisely the sort of 'subtle' discrimination . . . that the ADA aims to abolish").

through pain and risk of injury. First, Defendants offer no evidence that Mr. Adom was actually provided with showers and that he could meaningfully access these showers without pain or undue suffering. ER-133 (Declaration from R. Salinas, ADA Coordinator at SVSP, which explains that Mr. Adom "could" be afforded showers and that additional linen and clothing "may be required," but never stating that these accommodations were actually afforded to Mr. Adom). Second, Mr. Adom explained that even with the additional linens provided, he still had to suffer through excruciating pain when he woke in the middle of the night and had to rise, bend, and move about his bed to change into clean underwear or wrappings. ER-187. His alternative was to "live in human wa[]st[e]," risking infection and trying to sleep though the foul odor. ER-194. Further, because he was only provided with three additional pairs of boxers and towels, he would quickly run out of clean supplies, and thus had no accommodation at all. ER-196. Every single time this happened, Mr. Adom was denied meaningful access to toileting and hygiene.

### C. The district court incorrectly required Mr. Adom to show discriminatory animus.

The district court further erred by requiring that Mr. Adom prove that Defendants acted with animus towards him because of his disability. The opinion below is slightly unclear as to whether the court expected Mr. Adom to show discriminatory animus to satisfy the ADA's causation prong or to meet the "intentional discrimination" requirement imposed when an ADA plaintiff seeks

damages. Either would be error. To prevail on causation, Mr. Adom need only show that his disabilities impeded meaningful access to covered programs, services and activities. *See Duvall*, 260 F.3d at 1135; *supra* at 20–21. And this Court has explicitly rejected the argument that to show "intentional discrimination" for damages, a plaintiff must prove discriminatory animus, requiring instead only a showing of deliberate indifference. *See Duvall*, 260 F.3d at 1139; *supra* at 21–25.

The district court held that Mr. Adom's ADA claims failed because he did not show that the prison's refusal to accommodate him was "because of his disability." ER-012. The district court reasoned that "CDCR did not provide him . . . supplies [that he requested as an accommodation] [because] medical professionals determined he did not have a medical need for them, not because Defendants were deliberately discriminating against him due to his incontinence." [7] *Id.* In doing so, the district court required Mr. Adom to show that CDCR affirmatively treated him differently than nondisabled people when it denied his accommodations because of animus toward his disabled status. Such a requirement contradicts this Court's

[7] This district court also erred in making this finding of fact. The record does not support the inference that "medical professional determined that Mr. Adom had no need for" incontinence supplies." Dr. Lotersztain's declaration says only that the cause Mr. Adom's incontinence was "not clear," that his history was "vague." ER-131. Dr. Ladd's expert stated that stroke can lead to incontinence, and a history of stroke is documented in Mr. Adom's records. ER-165. These facts do not support the inference the district court arrived at, an inference that improperly favors defendants, the moving party.

caselaw and evinces a fundamental misunderstanding of the ADA. In fact, it gets causation in the failure-to-accommodate context completely backward.

The ADA aims to eradicate a type of discrimination that is marked not by different treatment but by similar treatment where difference is required. *McGary v. City of Portland,* 386 F.3d 1259, 1266 (9th Cir. 2004) (quoting *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F. Supp. 962, 965 (N.D. Cal.1998)) ("The ADA not only protects against disparate treatment, it also creates an affirmative duty in some circumstances to provide special, preferred treatment, or 'reasonable accommodation.'"). Congress's attention to this kind of discrimination is motivated by a recognition of the fact that "[e]ven facially neutral government actions that apply equally to disabled and nondisabled persons" may "unduly burden[] disabled persons." *Cohen*, 754 F.3d at 700 (9th Cir. 2014) (citations omitted); *see also Chapman v. Pier 1 Imports*, *Inc*., 631 F.3d 939, 944–45 (9th Cir. 2011) (explaining that the kind of discrimination that often confronts disabled people is not animus, but rather a "subtle" discrimination arising from "thoughtlessness and indifference"). Thus, "[a] plaintiff need not allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim." *McGary*, 386 F.3d at 1266. Importing an affirmative animus requirement of the sort the district court contemplates into the ADA would directly contradict this reasoning and would abrogate reasonable accommodation claims entirely.

Further, in the damages context, this Court has explicitly rejected the proposition that plaintiffs must show discriminatory animus to show "intentional discrimination." *Duvall*, 260 F.3d at 1139 (explaining that "the deliberate indifference standard … is better suited to the remedial goals of Title II of the ADA than is the discriminatory animus alternative"). This Court concluded that defendants act with deliberate indifference when they both have "knowledge that a harm to a federally protected right is substantially likely, and [] fail[] to act upon that the likelihood." *Id*.

As explained above, when evaluated under the correct standards, Mr. Adom has provided evidence sufficient to show that he was excluded from toileting and hygiene services because of his disability, and that CDCR acted with deliberate indifference. *Supra* at 20–25. He does not need to substantiate that CDCR intentionally discriminated against him or acted with animus, and the district court erred in requiring him to make this showing.

**D. Provision of adult diapers is a disability accommodation, not medical treatment.**

The district court again erred when it reasoned that summary judgment was appropriate because Mr. Adom's evidence of disability discrimination "most reasonably indicates a disagreement about treatment for Plaintiff's conditions, not a deliberate exclusion from programs, services, or activities because of a disability." ER-012. This reasoning alludes to the Court's holding in *Simmons v. Navajo County*,

that "[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability." 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled in part on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). *Simmons* adopts *Bryant v. Madigan*, a Seventh Circuit case which held that the "ADA does not create a remedy for medical malpractice" by speculating that Congress had not intended such a result. 84 F.3d 246, 249 (7th Cir. 1996). In other words, *Bryant* and *Simmons* create an atextual exception to ADA liability for failure to provide a reasonable accommodation if that accommodation is also medical treatment.

This Court has routinely reversed district courts that overread *Simmons*'s limit on ADA claims requesting medical treatment. These cases make clear that accommodations that facilitate equal access, as opposed to those that eliminate underlying impairments, are actionable under the ADA. In *Munoz v. California Department of Corrections and Rehabilitation*, this Court held that transfer to a low-bunk placement for a plaintiff with a history of knee problems was an accommodation, not medical treatment. 842 F. App'x at 62 ("Munoz does not argue he was denied adequate treatment for his knee injuries, only that he was denied an accommodation for his disability"). In *Barker v. Osemwingie*, this Court held that "[t]ransferring an inmate from a wheelchair to the toilet is an accommodation to provide access to toileting services, rather than medical treatment for a disability."

2021 WL 5564625, at *1. In *Morris v. California*, an incarcerated plaintiff with a mobility impairment sued CDCR for denying him a wheelchair, and this Court explained that "[t]he district court erred in construing Morris's requests as exclusively for medical treatment" and not also as an accommodation. No. 21-16059, 2022 WL 2901730, at *1 (9th Cir. 2022). Finally, in *Pamplin v. Lucas*, this Court reversed a district court that held that a mobility-impaired plaintiff's request to be transferred to a unit where he did not have to climb a hill was medical treatment, not an accommodation. No. 22-15284, 2023 WL 3478412, at *2 (9th Cir. May 16, 2023).

Mr. Adom's ADA claim cannot be rejected under *Simmons*'s and *Bryant*'s logic because the accommodation he seeks, adult diapers, in no way treats his incontinence. Mr. Adom continues to involuntarily evacuate urine and occasionally stool whether he wears an adult diaper or not. The diaper simply allows him to relieve himself without making a mess and without humiliation. Defendants themselves admit that diapers serve no treatment purpose. *See* ER-166 (Defendant's expert report explaining that "if Dr. Ladd simply provided the 'incontinence supplies', he wouldn't have been treating the underlying medication condition," and that "[s]imply giving Plaintiff 'incontinence supplies' does nothing to treat the condition or symptoms"); ER-151 (Defendant's counsel referring to incontinence supplies as an accommodation that will not treat incontinence, but instead is "just

going to clean up the result"). The diapers provide access to toileting services on par with nondisabled prisoners, which is precisely the goal of the ADA. *See* 28 C.F.R. § 35.130(b)(3) (requiring equal opportunity to participate for disabled and nondisabled people); *see also Jaros v. Illinois Dep't of Corr*., 684 F.3d 667, 672 (7th Cir. 2012) (explaining that ADA is violated when defendants' action prevent a plaintiff "from accessing [prison services] on the same basis as other inmates").

**E. Mr. Adom's injunctive claims under the ADA are not moot.**

Finally, Mr. Adom sought both injunctive relief and damages in his complaint, and this district court erroneously held that, because he is now receiving incontinence supplies, his injunctive ADA claim were moot. A case becomes moot only "when a plaintiff actually receives *all* of the relief he or she could receive on the claim through further litigation." *Chen v. Allstate Ins. Co*., 819 F.3d 1136, 1144–46 (9th Cir. 2016) (emphasis added). The standard for determining whether a defendant's voluntary conduct moots a case is "stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted).

Courts have been particularly reluctant to hold that ADA plaintiffs' claims are moot when the alleged barriers are not structural in nature, since nonstructural barriers (which would include the voluntary and continuous provision of supplies or

program modifications) are more likely to reoccur. *See, e.g.*, *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2013) (rejecting a mootness finding where the defendant's policy change "could be easily abandoned or altered in the future"); *Butler v. WinCo Foods*, *LLC*, 613 F. App'x 584, 585–86 (9th Cir. 2015) (defendant's creation of an exception to its guide animal policy for plaintiff did not moot case because exception was not "sufficiently entrenched and permanent" to prevent defendants from changing it); *c.f.*, *Ali v. Quarterman*, 434 F. App'x 322, 326 (5th Cir. 2011) (holding that issuing temporary exception to grooming policy did not moot the plaintiff's religious accommodation claim).

Defendants have not met their high burden to show that it is "absolutely clear" that Mr. Adom will not have his incontinence supplies suspended again. Mr. Adom's incontinence accommodation was revoked arbitrarily when he was between transferred units and, despite his consistent requests and obvious need, it took Defendants nearly five months reinstate them. ER-188. Even when it was reinstated, his supplies order was only logged as "temporary," and not "permanent." ER-188; ER-201; ER-231. And his access was only reinstated after Mr. Adom had begun filing grievances and taking action toward this litigation. ER-188. To this day, it has never been converted to a permanent order. Mr. Adom continues to experience incontinence, and he could be transferred again or have his temporary supplies terminated at any moment for another equally arbitrary rationale. Defendants offer

no evidence that they will continue to provide this accommodation so long as it is required to achieve meaningful access, making Mr. Adom's claims for injunctive relief reviewable and not moot.

## II. THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE TOWARD MR. ADOM'S NEED FOR EFFECTIVE INCONTINENCE AND CHRONIC PAIN CARE.

The district court also erred in granting Defendants summary judgment on Mr. Adom's Eighth Amendment claim. Mr. Adom has multiple serious medical needs including incontinence and chronic spinal pain. These two medical conditions combined led to nearly five months where Mr. Adom was suffering severe pain nightly. There are triable questions of fact as to whether Dr. Montegrande and Dr. Ladd acted with deliberate indifference toward Mr. Adom's care needs, bringing about these months of suffering.

Prison officials violate the Eighth Amendment when they are deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To show an Eighth Amendment violation under *Estelle*, this Court has held that, "[f]irst, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant[s'] response to the need was deliberately indifferent." *Wilhelm v. Rotman*,

680 F.3d 1113, 1122 (9th Cir. 2012) (*quoting Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

**A. Mr. Adom demonstrated a serious medical need.**

"Indicia of a 'serious' medical need include (1) the existence of an injury that a reasonable doctor would find important and worthy of comment or treatment, (2) the presence of a medical condition that significantly affects an individual's daily activities, and (3) the existence of chronic or substantial pain." *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)); *see also Egberto v. Nevada Dep't of Corr.*, 678 F. App'x 500, 503 (9th Cir. 2017) (reversing summary judgment in a case where plaintiff with chronic back pain showed "competing evidence concerning the source and extent of this pain," holding that because some doctors found his pain was worthy of treatment, there was a dispute of fact as to its objective severity).

Mr. Adom demonstrated two serious medical needs that, combined and untreated, led to his continual suffering over the four-to-five-month period at issue in this case. *Id*. The first was his incontinence. *See* ER-187 (showing that Mr. Adom's incontinence affected his daily life activities); *see also* ER-131 (showing that Dr. Lotersztain found Mr. Adom's incontinence "worthy of comment or

treatment”). The second is his chronic and severe spinal pain stemming from his spinal condition, which Mr. Adom explained was significantly exacerbated during this period because he had to move around at night to change soiled dressings. ER-241 (showing diagnosis for chronic pain syndrome); ER-187 (explaining that Mr. Adom experienced chronic and substantial spinal pain when he had to wake at night to address his incontinence). Combined, the failure to effectively treat Mr. Adom’s incontinence and his chronic spinal pain led to “unnecessary and wanton infliction of pain” each night when Mr. Adom would wake in urine and have to labor through his pain to change his clothing and bedding. ER-187.

Courts have recognized that incontinence, coupled with other symptoms such as pain and mobility limitations, constitutes a serious medical need. *See Adkins v. Morgan Cnty., Tennessee*, 798 F. App’x 858, 863 (6th Cir. 2020) (“[i]ncontinence and inability to walk” constitute serious medical needs); *Culver v. Bayola*, MD, No. 18-12968-G, 2019 WL 3247159, at *1 (11th Cir. Feb. 19, 2019) (“pain, numbness, and incontinence” constitute serious medical needs); *Taylor v. Franklin Cty.*, 104 F. App’x 531, 538 (6th Cir. 2004) (“incontinence and debilitating mobility were clear symptoms of a serious problem”); *see also Shiira v. Hawaii*, 706 F. App’x 436, 437 (9th Cir. 2017) (“chronic pain condition limiting ability to walk constituted serious medical need”).

### B. There are triable issues of fact as to whether Dr. Montegrande and Dr. Ladd acted with deliberate indifference to Mr. Adom's serious medical needs.

The second prong of the test, deliberate indifference, is met when a defendant "knows of and disregards" a plaintiff's serious medical needs. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). A plaintiff may rely on "circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003). Mr. Adom has provided evidence showing a genuine dispute of material fact as to Defendants Dr. Montegrande and Dr. Ladd's deliberate indifference.

#### *1. Dr. Montegrande*

Dr. Montegrande acted with deliberate indifference to Mr. Adom's serious medical needs when she (1) administered a medically unnecessary and excessively painful strength test on Mr. Adom, and (2) denied Mr. Adom incontinence care after he involuntarily urinated in front of her. ER-180–83. The intentional infliction of pain for nonmedical reasons demonstrates deliberate indifference. *Banks v. Hayward*, 216 F.3d 1082 (9th Cir. 2000) (treatment decisions made "for non-medical

reasons" that result in prisoners "suffering serious pain" violate the Eighth Amendment); *see also Spruill v. Gillis*, 372 F.3d 218, 237 (3d Cir. 2004) (holding that physician acted with deliberate indifference when, during an examination of a patient with a spinal injury, he intentionally "inflict[ed] pain on the plaintiff without any medical justification" by "twisting Spruill's legs 'as if he was trying to shape a pretzel'").

The district court erred when it held that Dr. Montegrande did not act with deliberate indifference. It reached this conclusion only after improperly weighing the evidence and impermissibly crediting Dr. Montegrande's account over Mr. Adom's. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"). Dr. Montegrande did not document the physical examination she performed on Mr. Adom in her medical note, nor did she document his incontinence complaint and explain her denial of care. ER-241; ER-139. Thus, all of the evidence concerning the context for and content of this examination, during which Mr. Adom experienced pain so severe that it caused him to involuntarily urinate, comes from Dr. Montegrande's and Mr. Adom's competing sworn statements. In three instances, the district court impermissibly resolved factual

disputes between these two declarations in Dr. Montegrande's favor instead of Mr. Adom's. *Anderson*, 477 U.S. at 255; Fed. R. Civ. P. 56.

First, the district court erroneously concluded that there was no dispute of fact over the medical basis for the exam. The district court held that Dr. Montegrande performed a strength examination on Mr. Adom because he refused to get on an examination table. ER-010. But Dr. Montegrande never indicated that Mr. Adom's purported refusal prompted the exam, or that such a refusal would make such an exam medically indicated. ER-138–40. Further, Dr. Montegrande never cited to a medical basis for the extremity strength exam at all; she maintains Mr. Adom was only being seen for an ophthalmology appointment follow-up. *Id*. In concluding this exam was appropriate, the district court improperly assumed evidence not in the record and made inferenced in Defendants' favor. Mr. Adom explicitly disputes that he refused to get on the table, which the district court ignored. ER-123 ("I did not refuse to get on a bed or an exam table"). If Mr. Adom in fact never refused to get on the examination table, and he was present only to go over the care recommendations of an outside ophthalmologist, Dr. Montegrande indisputably had no medical basis for putting Mr. Adom, a weak and multiply disabled wheelchair user, through this painful strength test. It was error for the district court to ignore Mr. Adom's record evidence and make inferences in Dr. Montegrande's favor. *See* Fed. R. Civ. P. 56.

Second, the district court again accepted Dr. Montegrande's sworn statement and ignored Mr. Adom's when it concluded that Dr. Montegrande used only de minimis force in her exam. Dr. Montegrande's declaration states that she gently pushed on Mr. Adom's extremities. ER-139. Mr. Adom's verified complaint and summary judgment declaration paint a very different picture. He states that that she "struck" him with so much force that he could not resist, that he had shooting pain down his spine, and that the pain was so severe that he urinated on himself. ER-182–83; ER-123. Twice, her force caused his arm or leg to give out and crash against his wheelchair, causing "abrasions." ER-184–85; ER-124. Dr. Montegrande continued the painful encounter in the face of Mr. Adom's wincing, and even after he notified her that he had wet himself. ER-184–85; ER-124. These factual disputes cannot be decided on summary judgment and must be determined by a factfinder.

Third, the district court erred by disregarding Mr. Adom's evidence showing that Dr. Montegrande was aware of his incontinence and failed to take any action. ER-007 (characterizing Dr. Montegrande's appointment with Mr. Adom as regarding only an "unrelated ophthalmology issue"). This conclusion, again, construes facts in favor of the moving party when Mr. Adom presented evidence that directly contradicts Dr. Montegrande's. ER-139 (Dr. Montegrande states "I did not examine Plaintiff Adom for incontinence issues, or prescribe or discontinue any incontinence supplies, because he was only present for a follow-up after an off-site

ophthalmology appointment"), ER-123–24 (Mr. Adom states that he involuntarily urinated in his appointment with Dr. Montegrande and that he "requested incontinence supplies from Dr. Montegrande."). These statements, read, as they must be at this stage of the case, in the light most favorable to Mr. Adom, show that Dr. Montegrande was aware of Mr. Adom's incontinence and took no action at all to investigate or treat this serious condition. The district court erred by ignoring this evidence.

2. *Dr. Ladd*

Dr. Ladd, too, acted with deliberate indifference toward Mr. Adom's serious medical needs. The district court held that Dr. Ladd did not act with deliberate indifference because he subjectively believed there was no medical basis for Mr. Adom's incontinence and because Mr. Adom was only "temporarily" deprived of incontinence treatment. ER-007–09. This reasoning is legally insufficient, and the record does not support these conclusions.

The district court erred in holding that Defendants acted with deliberate indifference toward Mr. Adom's serious medical needs because there was "no indication his incontinence had a medical cause or that he had a medical need for incontinence supplies." ER-007. First, the record does not support the conclusion that there was "no indication" that Mr. Adom's incontinence was medically caused. Dr. Ladd's medical note points to the conclusion that Dr. Ladd *did* believe that there

could be a medical cause for Mr. Adom's incontinence. ER-250. The fact that Dr. Ladd prescribed medication for Mr. Adom's incontinence, a more invasive intervention than allowing Mr. Adom to wear a diaper, undercuts his assertions that he did not subjectively believe that Mr. Adom had a medical condition leading to these symptoms. ER-250. Dr. Ladd argued that nothing in Mr. Adom's medical records indicated incontinence risk, but his own expert states that after a stroke (or cardiovascular accident, "CVA,") "patients can develop incontinence." ER-165. Additionally, Dr. Ladd originally told Mr. Adom that he would not order diapers for the non-medical reason that he knew "prisoners" to be "malingering" their incontinence symptoms. ER-045. But he never provides any evidence that Mr. Adom is one such prisoner, nor that Dr. Ladd even believes that Mr. Adom falls into this category. In fact, later in the conversation, Dr. Ladd told Mr. Adom that he understood that Mr. Adom "might be different," because he was reporting specific symptoms and previously had an accommodation in place. *Id.* When Mr. Adom tried to continue the conversation and further explain his need, Dr. Ladd said "I think we're done here," and left. *Id.*

Second, Dr. Ladd's awareness of Mr. Adom's serious medical symptoms—his months of incontinence combined with his severe and mobility-impairing spinal pain—is sufficient to require that he take action. Defendants do not need to be aware of the root causes of physical symptoms to be required to treat them. This Court has

held medical providers liable for Eighth Amendment violations when they have subjective awareness of serious medical *symptoms*, even if the root cause of those symptoms is unknown. *See, e.g., Stewart v. Aranas*, 32 F.4th 1192, 1194 (9th Cir. 2022) (holding that prison doctors were deliberately indifferent when they failed to investigate and treat plaintiff's difficulty urinating and abdominal and kidney pain, even though he was not diagnosed with an underlying prostate condition until he was transferred to a different prison years later). Allowing defendants to escape liability because they failed to investigate and diagnose reports of concerning symptoms would render the Eighth Amendment a dead letter.

Finally, the fact that Mr. Adom eventually received treatment for his incontinence from another doctor does not defeat his claim that Dr. Ladd was deliberately indifferent. ER-131 (showing that Mr. Adom was eventually seen by Dr. Lotersztain, who prescribed a new medication, conducted an examination, ordered a urine culture, and reinstated Mr. Adom's incontinence supplies). Given Dr. Ladd's knowledge of the severity of Mr. Adom's symptoms, Dr. Ladd's failure to act during the period of time before Dr. Lotersztain provided further treatment is sufficient to show deliberate indifference on Dr. Ladd's part. *See McGuckin*, 974 F.2d at 1060. ("the fact that an individual sat idly by as another human being was seriously injured despite the defendant's ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the prisoner's suffering"). Mr.

Adom suffered through untreated incontinence and nightly severe pain for nearly five months. ER-187 He informed Dr. Ladd of this ordeal. ER-045. In response, the only treatment Dr. Ladd provided was a prescription for a medication, oxybutynin, on a trial basis. ER-250. But Dr. Ladd then terminated that medication after only one week. ER-186. Dr. Ladd took no further action to address Mr. Adom's incontinence or associated pain. This inaction in the face of Mr. Adom's continual suffering is sufficient to raise a trailable issue of fact on Dr. Ladd's deliberate indifference to Mr. Adom's serious medical needs.

## CONCLUSION

For the forgoing reasons, this court should reverse the district court's grant of summary judgment to defendants and remand for further proceedings.

Respectfully Submitted,

*/s/ Lillian Novak*
Lillian Novak
Amaris Montes
Samuel Weiss
Rights Behind Bars
1800 M St. NW, Front 1 #33821
Washington, DC 20033
202-455-4399
lily@rightsbehindbars.org

*Counsel for Plaintiff-Appellant Bilal Adom*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,827 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that his brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word with a Times New Roman 14-point font.

Date: December 12, 2024

*/s/ Lillian Novak*
Lillian Novak

Rights Behind Bars
1800 M St. NW, Front 1 #33821
Washington, DC 20033

*Attorney for Appellant Bilal Adom*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: December 12, 2024

*/s/ Lillian Novak*
Lillian Novak

Rights Behind Bars
1800 M St. NW, Front 1 #33821
Washington, DC 20033

*Attorney for Appellant Bilal Adom*