No. 24-4756

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

BILAL ADOM,

*Plaintiff-Appellant,*

v.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND
REHABILITATION, ET AL.,

*Defendants-Appellees.*

_____

**On Appeal from the United States District Court
for the Northern District of California**
No. 4:22-cv-07150-JSW
The Honorable Jeffrey S. White

_____

## ANSWERING BRIEF

_____

Rob Bonta
   *Attorney General of California*
Monica N. Anderson
   *Senior Assistant Attorney General*
Neah Huynh
   *Supervising Deputy Attorney General*
Jaime Ganson
   *Deputy Attorney General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 212-7351
Jaime. Ganson@doj.ca.gov
   *Attorneys for Defendants-Appellees
   CDCR, Atchley, Lotersztain, Mojica,
   Montegrande, and Sawyer*

February 28, 2025

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................... 1

Statement of Jurisdiction ................................................................ 3

Issue Statements ............................................................................. 3

Addendum ...................................................................................... 4

Statement of the Case ..................................................................... 4

I.     Adom Makes Only a Limited Challenge to the District Court's Judgment. .................................................................... 4

II.    CDCR Provides Medically Necessary Accommodations. ........ 7

III.   Prison Medical Staff Treated Adom But Initially Found No Medical Cause for His Reports of Occasional Urinary Incontinence, Which He Claimed Occurred Primarily at Night. ....................................................................................... 8

IV.   Dr. Montegrande Saw Adom Only Once, to Follow Up Regarding an Off-Site Ophthalmology Appointment. ............ 11

V.    After Consulting With Medical, the Prison's Reasonable Accommodation Panel Approved Adom's Accommodation Request in Part ...................................................................... 14

VI.   Warden Atchley Delegated Inmate Letters to His Staff for Investigation and Response. .................................................... 17

VII.  Dr. Ladd Found No Clear Medical Indication for Incontinence Supplies but Treated Adom's Complaints of Urinary Incontinence With a Trial of Oxybutynin .................. 18

VIII. Incontinence Supplies Were Found to Be Medically Indicated After Adom Was Diagnosed With an Enlarged Prostate. ................................................................................. 18

IX.   Chief Executive Officer Sawyer Conducted an Administrative Review of Adom's Grievances. ...................... 20

Standard of Review ....................................................................... 23

Summary of the Argument ............................................................ 23

i

# TABLE OF CONTENTS
## (continued)

Page

Argument.................................................................................. 25

I. No Eighth Amendment Violation Occurred. .......................... 25

    A. Eighth Amendment Legal Standard............................. 25

    B. Dr. Montegrande Did Not Violate the Eighth Amendment. .................................................................. 26

        1. Dr. Montegrande's strength and reflex examination constituted at most de minimis force and was not motivated by evil intent to cause harm. ........................................................ 26

        2. Dr. Montegrande cannot be vicariously liable for other personnel's responses to Adom's complaints of urinary incontinence. ................... 28

        3. Adom's remaining arguments lack merit. .......... 31

II. Dr. Montegrande Is Qualifiedly Immune Because She Did Not Violate Clearly Established Eighth Amendment Law. ..... 34

III. No ADA Violation Occurred. .................................................. 36

    A. ADA Legal Standard..................................................... 36

    B. Adom Failed to Demonstrate an ADA Violation. ........ 37

        1. A "disability" under the ADA is measured by the impairment imposed on major life activities.............................................................. 37

        2. Adom was not "otherwise qualified" to participate in the prison service at issue. ............ 38

        3. Adom was not excluded from prison services "because of" his disability. ................................ 39

        4. Adom's newly asserted toileting and hygiene claims fail............................................................ 42

# TABLE OF CONTENTS
## (continued)

Page

a. Adom waived any challenge concerning his purported exclusion from prison hygiene and toileting services by failing to raise these claims in the district court.................................... 42

b. Should this Court consider Adom's new prison toileting and hygiene services claims, no ADA violation occurred. .................................................. 43

5. Adom's reliance on *Munoz* and other case law is misplaced. ........................................................ 45

C. Adom's Claim for Monetary Damages Under the ADA Fails Because he Did Not Establish the Requisite Discriminatory Intent.................................... 46

D. Adom's Claim for Injunctive Relief Fails. .................. 50

1. Legal standard.................................................... 50

2. Adom is not entitled to injunctive relief............. 51

Conclusion ................................................................................. 54

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Acosta-Huerta v. Estelle*
   7 F.3d 139 (9th Cir. 1992) .................................................. 7

*Albertson's, Inc. v. Kirkingburg*
   527 U.S. 555 (1999)............................................................ 37

*Amyette v. Providence Health Sys.*
   388 F. App'x 606 (9th Cir. 2010) ...................................... 37

*Anderson v. Cnty. of Kern*
   45 F.3d 1310 (9th Cir.) ...................................................... 30

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986).................................................... 33, 46

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*
   60 F. 3d 337 (9th Cir. 1995) ............................................. 33

*Ashcroft v. al-Kidd*
   563 U.S. 731 (2011)........................................................... 34

*Baldwin v. Trailer Inns, Inc.*
   266 F.3d 1104 (9th Cir. 2001) .......................................... 42

*Banks v. Hayward*
   216 F.3d 1082 ................................................................... 32

*Barker v. Osemwingie*
   No. 20-15503, 2021 WL 5564625 (9th Cir. Nov. 29, 2021)
   ....................................................................................... 43

*Bibeau v. Pac. Nw. Research Found. Inc.*
   188 F.3d 1105 (9th Cir. 1999) .......................................... 34

*Campidoglio LLC v. Wells Fargo & Co.*
   870 F.3d 963 (9th Cir. 2017) ............................................ 23

iv

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Cole v. Oroville Union High Sch. Dist.*
   228 F.3d 1092 (9th Cir. 2000) ........................................... 23

*Davis v. Fed. Election Comm'n*
   554 U.S. 724 (2008) ................................................... 50, 51

*Davis v. Hall*
   375 F.3d 703 (8th Cir. 2004) ............................................ 34

*Duvall v. Cnty. of Kitsap*
   260 F.3d 1124 (9th Cir. 2001) ...................................... 46, 47

*Elsayed Mukhtar v. Cal. State Univ., Hayward*
   299 F.3d 1053 (9th Cir. 2002) ........................................... 33

*Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*
   548 F.3d 1184 (9th Cir. 2008) ........................................... 50

*Farmer v. Brennan,*
   511 U.S. 825, 837 (1994) ................................................. 30

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*
   528 U.S. 167 (2000) ................................................... 51, 53

*Garcia v. Google, Inc.*
   786 F.3d 733 (9th Cir. 2015) ........................................ 52, 53

*Giles v. Godinez*
   914 F.3d 1040 (7th Cir. 2019) ...................................... 48, 49

*Gomez v. Vernon*
   255 F.3d 1118 (9th Cir. 2001) ........................................... 51

*Hall v. Higgins*
   77 F.4th 1171 (8th Cir. 2023) ............................... 37, 40, 45

*Hamby v. Hammond*
   821 F.3d. 1085 (9th Cir. 2016) ........................................... 35

## TABLE OF AUTHORITIES
### (continued)

Page

*Hudson v. McMillian*
503 U.S. 1 (1992)........................................................ 25, 35

*Hudson v. McMillian*
503 U.S. 1 (1992)............................................................ 27

*Hunter v. Bryant*
502 U.S. 224 (1991)......................................................... 34

*In re E.R. Fegert, Inc.*
887 F.2d 955 (9th Cir. 1989) ....................................... 42, 43

*Johnson v. Doughty*
433 F.3d 1001 (7th Cir. 2006) .......................................... 48

*Johnson v. Duffy*
588 F.2d 740 (9th Cir. 1978) ............................................ 28

*Johnson v. Lewis*
217 F.3d 726 (9th Cir. 2006) ............................................ 26

*Leer v. Murphy*
844 F.2d 628 (9th Cir. 1988) ............................................ 28

*McGary v. City of Portland*
386 F.3d 1259 (9th Cir. 2004) ........................ 36, 38, 39, 49

*Munoz v. California Department of Corrections and*
*Rehabilitation*
842 F. App'x 59 (9th Cir. 2021) ........................................ 45

*O'Guinn v. Lovelock Corr. Ctr.*
502 F.3d 1056 (9th Cir. 2007) .......................................... 36

*O'Guinn v. Nev. Dep't of Corr.*
468 Fed. App'x. 651 (9th Cir. 2012) .................... 38, 39, 44

## TABLE OF AUTHORITIES
### (continued)

Page

*Oliver v. Keller*
    289 F.3d 623 (9th Cir. 2002) ............................................ 27

*Pierce v. Cnty. of Orange*
    526 F.3d 1190 (9th Cir. 2008) .......................................... 27

*Rizzo v. Goode*
    423 U.S. 362 (1976) .................................................. 50, 51

*Rosebrock v. Mathis*
    745 F.3d 963 (9th Cir. 2014) ............................................ 54

*Saucier v. Katz*
    533 U.S. 194 (2001) .......................................................... 34

*Sharp v. Cty. of Orange*
    871 F.3d 901 (9th Cir. 2017) ............................................ 35

*Shaw v. Kemper*
    52 F.4th 331 (7th Cir. 2022) ............................................. 37

*Shoshone-Bannock Tribes v. Fish & Game Comm'n*
    42 F.3d 1278 (9th Cir. 1994) ............................................ 34

*Simmons v. G. Arnett*
    47 F.4th 927 (9th Cir. 2022) ............................................. 26

*Simmons v. Navajo County, Ariz.*
    609 F.3d 1011 (9th Cir. 2010) ........................ 36, 39, 40, 44

*Smith v. Mack Trucks, Inc.*
    505 F.2d 1248 (1974) .................................................. 32, 43

*Soremekun v. Thrifty Payless*
    509 F.3d 978, 984 (2007) ................................................. 41

*Soto v. Sweetman*
    882 F.3d 865 (9th Cir. 2018) ........................... 33, 41, 43, 46

# TABLE OF AUTHORITIES
## (continued)

Page

*Spruill v. Gillis*
372 F.3d 218 (3d Cir. 2004)...................................31, 48, 49

*Starr v. Baca*
652 F.3d 1202 (9th Cir. 2011) ...........................................49

*Tennessee v. Lane*
541 U.S. 509 (2004).........................................................41

*Toguchi v. Chung*
391 F.3d 1051 (9th Cir. 2004) ..............................25, 26, 49

*Toussaint v. McCarthy*
801 F.2d 1080 (9th Cir. 1986) ...........................................53

*Whitley v. Albers*
475 U.S. 312 (1986).........................................................26

*Wiggins v. Rushen*
760 F.2d 1009 (9th Cir. 1985) ...........................................52

*Wood v. Housewright*
900 F.2d 1332 (9th Cir. 1990) ...................................25, 26

**STATUTES**

United States Code, Title 18
§ 3626...............................................................................51
§ 3626(a)(1).......................................................................51
§ 3626(g)(7) ......................................................................51

United States Code, Title 42
§ 12102(2)(A) ...................................................................37
§ 12132.............................................................................36

**TABLE OF AUTHORITIES**
**(continued)**

Page

California Code of Regulations, Title 15

§ 3999.98................................................................8

§ 3999.390..............................................................7

§ 3999.393(a)(1) ..................................................8, 45

§ 3999.394(a) ..........................................................7

§ 3999.394(c) ....................................................*passim*

§ 3999.394(d) ....................................................*passim*

§ 3999.394(g)......................................................8, 52

§ 3999.394(h)...........................................................8


**CONSTITUTIONAL PROVISIONS**

United States Constitution Eighth Amendment...............*passim*

**COURT RULES**

Federal Rules of Appellate Procedure

28(a)(8)(A) ............................................................7

Ninth Circuit Rule

28-2.7 ..................................................................4

36-3 ...................................................................32

## INTRODUCTION

Plaintiff Bilal Adom began experiencing occasional episodes of urinary incontinence and sought diapers "primarily for overnight protection." (ER-187.) Prison doctors provided a weekly supply of diapers while a battery of tests and medical evaluations were undertaken, but no medical cause was initially found. None of the medical professionals who treated Adom opined that incontinence supplies were medically necessary, and the accommodation was later terminated on this ground.

When Adom sought to reinstate the accommodation, he provided only a bare description of the issue, stating he could not completely control his urination. However, once Adom explained that he was experiencing incontinence regularly and that it was painful to change out his linens and supplies, he was reexamined, provided medications, diagnosed with an enlarged prostate, and enrolled in the prison's Durable Medical Equipment program for steady access to incontinence supplies. Indeed, Adom was enrolled in that program for almost a year before he filed suit. Thus, CDCR did not exclude Adom from the Durable Medical Equipment program *because of* his disability but rather enrolled him into the program once there was medical approval. To that end, Adom's complaint about the delay in receiving incontinence supplies boiled down to a delayed treatment or diagnosis issue, which is not actionable under the ADA. As for Adom's newly

1

raised claims concerning his purported exclusion from prison toileting and hygiene services, they are waived because they were not raised below. And they fail on the merits regardless because they are not supported by the evidence.

Meanwhile, Adom was treated for other issues, including an eye condition. Following Adom's visit with an outside ophthalmologist, Dr. Montegrande met with Adom to discuss follow-up care. Because the purpose of this examination was to discuss the treatment notes from Adom's visit with the outside ophthalmologist, Dr. Montegrande did not assess him for incontinence, discuss his incontinence accommodation, or interfere with his incontinence accommodation. Although Adom purportedly experienced urinary incontinence during the appointment, it did not pose any risk of harm to him. Adom's account that Dr. Montegrande conducted a "forceful physical exam" when carrying out routine strength and reflex testing did not exceed the Eighth Amendment's de minimis threshold. (AOB 8.) Nor did Adom ask Dr. Montegrande to stop the strength and reflex exam; rather, he continued to participate in the exam. Because the exam was designed to test Adom's physical strength and reflexes, there is no evidence that Dr. Montegrande intentionally and wantonly inflicted pain simply to cause him harm. Thus, the district court properly entered summary judgment for Dr. Montegrande.

This Court should affirm the judgment for Dr. Montegrande and CDCR because Adom fails to show reversible error, and for Atchley, Lotersztain, Mojica,

Montegrande, and Sawyer on waiver grounds because Adom does not challenge the district court's grant of summary judgment to them.

## STATEMENT OF JURISDICTION

Defendants agree with Adom's jurisdictional statement. (AOB 2.)

## ISSUE STATEMENTS

1.     An Eighth Amendment medical claim requires a showing that the defendant deliberately ignored a substantially serious medical need. Was summary judgment appropriate where Dr. Montegrande saw Adom only for an ophthalmology follow-up, purportedly did not address an episode of incontinence that posed no risk to Adom, and conducted a medical strength and reflex examination that tested his extremities for medical purposes but did not exceed the Eighth Amendment threshold for use of force?

2.     Qualified immunity protects state officials from liability unless their conduct was indisputably unlawful. Could a reasonable prison doctor believe that Dr. Montegrande did not violate the Eighth Amendment when she saw Adom for an ophthalmology follow-up, resolved his concerns about his prescription, purportedly conducted a strength and reflex exam too roughly for Adom's comfort, and did not address a single episode of incontinence?

3.     Although the ADA prohibits disability discrimination, it does not provide a remedy for disagreements about the treatment provided for a disability.

3

Did the district court properly grant summary judgment where Adom's ADA claim rested solely on his assertion that he was initially excluded from the prison's Durable Medical Equipment program pending a medical diagnosis, and therefore amounts to an inactionable challenge concerning the treatment provided? Relatedly, did Adom have standing to bring an injunctive claim given he was already enrolled in the Durable Medical Equipment program for almost a year before he filed suit?

## ADDENDUM

The state regulations cited in this brief are included in the addendum to this brief, per Circuit Rule 28-2.7.

## STATEMENT OF THE CASE

### I. ADOM MAKES ONLY A LIMITED CHALLENGE TO THE DISTRICT COURT'S JUDGMENT.

Adom filed suit, and the district court screened his complaint and recognized only two sets of claims. (ER-168–70.) The first set was an ADA claim against CDCR and Eighth Amendment claims against Dr. Montegrande, Dr. Ladd, and four other medical and custody personnel (Mojica, Atchley, Dr. Lotersztain, and Sawyer) for not providing incontinence supplies between September 9, 2021, and January 19, 2022. (ER-46, 168–70.) The second set consisted of an Eighth Amendment claim against Dr. Montegrande for the way she performed the strength

and reflex exam and an Eighth Amendment claim against Dr. Lotersztain for the prostate exam. (ER-168–70.) The court dismissed all other claims for failure to state a claim. (*Id*.)

Dr. Ladd, represented by separate counsel, moved for summary judgment. (ER-263 (docket no. 36).) So did the medical and custody defendants represented by the Attorney General's Office. (ER-263 (docket no. 37).) Adom opposed both motions, and the defendants replied. (ER-264 (docket nos. 44–46).)

The court found that Adom failed to demonstrate an Eighth Amendment violation. (ER-7.) Despite examinations by multiple medical professionals, Adom's incontinence was not initially supported by any medical diagnosis or a finding of medical necessity. (*Id.*) Although Adom's history of incontinence was vague and primarily caused him concern at night, the medical team tried various medications, ordered a urine culture to rule out infection, and ultimately performed a prostate examination. (*Id.*) Meanwhile, during the four months that incontinence supplies were not authorized, medical and custody staff approved an alternate accommodation that included shower access and clean clothing and linens. (*Id.*) The court held that this evidence at most showed a disagreement about the appropriate course of treatment, not deliberate indifference. (ER-7–9.)

The court also found that Dr. Montegrande's strength and reflex testing, even if conducted forcefully, did not exceed the Eighth Amendment's de minimis

threshold. (ER-10.) Likewise, Dr. Lotersztain's prostate exam, albeit uncomfortable, was brief and was medically necessary to investigate Adom's complaints of incontinence. (ER-9-10.) The district court did not reach the issue of qualified immunity.

As for the ADA claim against CDCR, the court found that this claim failed because Adom did not show he was discriminated against because of a disability; rather CDCR did not provide incontinence supplies because medical professionals had not yet determined they were medically necessary.[1] (ER-10–12.) Additionally, Adom did not have standing to bring a claim for injunctive relief because he had already enrolled in the Durable Medical Equipment program with continuous access to incontinence supplies for nearly a year before he brought suit, and his claim for damages failed because he did not demonstrate deliberate indifference. (ER-7, 11–12.)

On appeal, Adom challenges only the district court's grant of summary judgment to CDCR on the ADA claim and to Dr. Montegrande and Dr. Ladd on

---

[1] While the court erroneously stated that Adom did not specifically address or oppose CDCR's argument on this claim (*compare* ER-10 *with* ER-71–73), the ADA claim rests on the same allegations and evidence as Adom's individual claims, which the court addressed. (*Compare* ER-71–73 *with* ER-63–70 *and* ER-9, *see also* ER-2–9.)

the Eighth Amendment claims.[2] The facts relevant to this limited challenge are as follows.

## II. CDCR PROVIDES MEDICALLY NECESSARY ACCOMMODATIONS.

CDCR provides prisoners with durable medical equipment and supplies that are medically necessary to ensure equal access to prison services, programs, and activities. Cal. Code Regs. tit. 15 §§ 3999.390, 3999.394(a), (d) (authorizing prison doctors to initiate an accommodation request "based on medical necessity."). Designated medical staff distribute these medical supplies and accommodations, as dictated by the Durable Medical Equipment and Medical Supply Formulary, to promote consistency in the way these items are provided. (ER-101–02.)

Relevant here, the Formulary authorizes the distribution of diapers when medically necessary due to an underlying medical condition that involves the loss of bowel or bladder control. *See* California Correctional Health Care Services (CCHCS) Durable Medical Equipment and Medical Supply Formulary Utilization Management, at p. 107 (*available at* https://cchcs.ca.gov/wp-content/uploads/sites/60/PR/DME-Medical-Supply-Formulary.pdf).

---

[2] Given Adom's limited challenge on appeal, this Court should summarily affirm on waiver grounds the claims dismissed at the screening stage and the grant of summary judgment for Mojica, Atchley, Dr. Lotersztain, and Sawyer. *Acosta-Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1992); Fed. R. App. P. 28(a)(8)(A).

Prisoners can request accommodations by submitting a healthcare service or reasonable accommodation request form. Cal. Code Regs. tit. 15 § 3999.394(c). When an accommodation is authorized, it is designated as temporary or permanent. Accommodations designated as temporary remain in force for the designated period but can be renewed at any time, as indicated by the patient's status. *Id.* at § 3999.394(h). Accommodations designated as permanent do not expire at a predetermined time but they may be revised or removed at any time based on the patient's status. *Id.* at § 3999.394(g), *see also* § 3999.98 (defining "permanent" as "expected to last longer than six months.").

Hygiene supplies are not considered medical supplies or durable medical equipment and thus are readily available upon request from custody staff. *Id.* at § 3999.393(a)(1).

### III. PRISON MEDICAL STAFF TREATED ADOM BUT INITIALLY FOUND NO MEDICAL CAUSE FOR HIS REPORTS OF OCCASIONAL URINARY INCONTINENCE, WHICH HE CLAIMED OCCURRED PRIMARILY AT NIGHT.

While incarcerated at Salinas Valley State Prison, Adom began experiencing episodes where he could not consistently control his urination, particularly at night.[3] (ER-180, 187.) Adom submitted a request for healthcare services in late

---

[3] While the opening brief references incontinence of urine and "occasionally stool" (AOB 7, 10, 27), Adom limited his complaint to urinary incontinence. (*See* ER 58 ("Plaintiff was complaining about involuntary urination symptoms"), 66 (same), 71

(continued…)

2020. (ER-180.) Alpha Yard medical staff authorized a weekly supply of incontinence supplies (adult diapers, chux[4], and wipes) while tests and medical evaluations were undertaken to determine the cause. (ER-79, 81, 180.) No medical cause was found and no doctor opined that incontinence supplies were medically necessary. (*Id.*)

Around the time of Adom's August 16, 2021 transfer to Delta Yard, a medical review was conducted that revealed no qualifying diagnosis or determination of medical necessity for incontinence supplies, so the authorization was terminated. (ER-119, 139, 231.) Adom received his last two issues of supplies on August 20 and September 1, 2021. (ER-55, 79, 81, *see also* ER-46, 181.)

Two weeks later, Adom submitted two healthcare service requests stating he had not received incontinence supplies the previous Friday and he needed them, particularly at night. (ER-96–97 (9/13 and 9/17 requests); ER-185 (also asserting that nonparty custody staff did not permit him to go to the clinic to pick up

---

(addressing only urination), ER-151 ("I was only concerned about protecting myself from these involuntary urinations, and that was my only concern"), 180 (listing among medical conditions only "URINARY INCONTINENCE"), 183 (describing urinary incident), 192 (same, and clarifying "specifically the restrictions faced by Adom when urine exited his body"), 193 ("limited … ability to control urine evacuation"), 195 (addressing requested incontinence protections to "collect his 'involuntary' urine evacuations"), 198 (urinary incontinence), 201 (same), 202 (accommodation request for same), 203 (same).)

[4] Chux are large absorbent pads for beds and seating surfaces.

supplies that week).) A subsequent medical determination found that diapers were not medically necessary. (ER-35, 37, 84, 165, 225.)

However, as discussed *infra*, Adom subsequently received a modified accommodation that provided access to a shower and fresh clothing or linens whenever an incident occurred.[5] (ER-136.) There is no evidence concerning how often Adom experienced incontinence while this accommodation was in effect, or whether he ever attempted to use this accommodation. Also as discussed *infra*, at the appointment where the incontinence supply accommodation was restored, Adom alerted staff that he was experiencing back pain at night when getting up to change after an episode of incontinence and that this was part of his need for an accommodation. (ER-187.)

Diapers do not prevent incontinence from occurring; they only help treat the symptoms. (ER-151.) The exposure to urine posed no substantial risk of harm to Adom. (ER-167.) Adom's only physical injury was the back pain he experienced when getting up at night to change. (ER-46, 160 (no rashes, no bedsores), 161–62 (no infections, no injury from the urine itself).) Further, Adom made his own

---

[5] While this accommodation was granted subject to safety and security concerns, Adom did not show that such concerns ever became a limiting factor. (ER-136; *see* AOB 30–31.)

incontinence supplies during the period at issue, which "provided … the urinary protections that [he] needed." (ER-152, 159, 160.)[6]

## IV. DR. MONTEGRANDE SAW ADOM ONLY ONCE, TO FOLLOW UP REGARDING AN OFF-SITE OPHTHALMOLOGY APPOINTMENT.

Dr. Montegrande saw Adom only once — on September 10, 2021 — for a routine specialty follow-up visit after Adom's off-site appointment with an ophthalmologist in the community.[7] (ER-138–39, 146, 181–82, 200.) All inmates returning from off-site medical appointments are scheduled for follow-up appointments with a prison doctor to ensure that specialists' treatment recommendations are reviewed and implemented, and any necessary prescriptions submitted. (ER-138–39.)

When Adom arrived at the clinic, he asked Nurse Rubio for incontinence supplies. (ER-181.) Adom planned to "quickly apply" one of the diapers while waiting to see the doctor. (*Id*.) Nurse Rubio directed Adom to a licensed vocational nurse assigned to that duty. (ER-181–82, 185; SER-15.)

Nurse Rubio remained present during Adom's examination. (ER-139, 182–83.) Adom contends that the examination room was small and did not contain a

---

[6] While the opening brief cites ER-194 to assert that Adom did not always have materials to make such supplies, the cited text states only that he constantly used materials to make his own supplies, not that he ran out of materials to use.

[7] Dr. Montegrande was the yard's primary care doctor from mid-August through mid-September, and did not conduct Adom's October 1, 2021 examination. (ER-29–30, 138–40, 162, 200.)

table, and he remained seated in his wheelchair throughout the exam. (ER-139, 182.) When Dr. Montegrande entered the exam room, she immediately stated that the appointment was only to follow up on Adom's recent ophthalmology appointment.[8] (ER-123, 182; SER-15.) After inquiring about Adom's wheelchair use and stroke history, Dr. Montegrande conducted standard extremity strength and reflex tests. (ER-139.)

A strength test consists of pressing against the patient's extended arms and legs, one at a time, while the patient resists the pressure as best as they can. (ER-139.) Dr. Montegrande instructed Adom to extend his non-impaired leg and press downward against it while instructing him to resist. (ER-58, 139, 182.) Adom contends that she was "pushing and striking downward" roughly. (ER-139, 182–83.) The pressure Adom used to resist exacerbated his back pain, and when the leg no longer could resist it collapsed down, striking the edge of his wheelchair's metal footrest, causing him to wince in pain and sustain abrasions. (SER-15; ER-139, 182–83.) Adom purportedly realized he had urinated and asked Dr.

---

[8] The parties agree that expert Dr. Cello's summary of Dr. Montegrande's treatment should be disregarded because it is incorrect: he misread the record to state that she saw Adom for urinary incontinence and prescribed oxybutynin when she did not. (*See* AOB 9 at n.3; ER-15 (explaining Dr. Cello mistakenly attributed another doctor's treatment notes to Dr. Montegrande), ER-25, 44 (Adom's agreement concerning the error), ER-241–42 (copy of medical record with Dr. Ladd's treatment notes at the top of the page); *Cf.* ER-32–33 (alternate copy showing only Dr. Montegrande's treatment).)

Montegrande for a diaper. (ER-183 (he "asked Dr. Montegrande about getting maintenance supplies (a diaper)"); *Cf.* AOB 8 (asserting he "told Dr. Montegrande about his incontinence").)

Adom did not allege that he asked Dr. Montegrande to stop the strength and reflex exam due to the pain; in fact, the record confirms he made a reasoned choice to proceed with the exam. (*See* ER-182–84; SER-8 (acknowledging his nonverbal consent).) Dr. Montegrande performed a standard reflex exam by tapping his knees with a small rubber reflex hammer. (ER-139, 183–84.) She also conducted a strength test on Adom's right arm, placing his hand on his right shoulder and instructing him to push back while she pressed against it. (ER-139, 184.) Adom complied. (*Id.*) Dr. Montegrande then placed Adom's forearm on the armrest and flung his hand toward his shoulder. (*Id.*) Adom's arm purportedly "bounced off his shoulder and landed in the [wheelchair's] metal brake handle," clipping the armrest on the way and causing pain and abrasions that did not require medical attention. (ER-60, 139, 184.)

Adom did not complain during the appointment that the examination was being conducted too roughly (*see* ER-139, 183–84), and his medical records do not document any injury or treatment related to the examination. (2-ER-139.)

Besides reviewing the ophthalmologist's treatment notes with Adom, Dr. Montegrande also addressed his concern about whether an eye medication was

discontinued, contacted the pharmacy to learn that refills were available upon patient request, and arranged for delivery of the medication to Adom that day. (ER-32.) Dr. Montegrande also ordered a follow-up with the ophthalmologist. (*Id.*)

Dr. Montegrande did not discontinue Adom's incontinence supplies because they were already discontinued before she saw him. (ER-139.) Further, it is undisputed that she also did not assess Adom for incontinence or discuss his incontinence or incontinence supplies with him, as that was not the purpose of the examination that day. (ER-30, 32, 44, 122, 124; *see also* ER-45 ("no discussions with any PCP [primary care physician] regarding urinary issues or supplies" before December 7, 2021).)

After the appointment, Adom learned that his incontinence supplies had been discontinued and speculated that "medical staff" had discontinued them because he filed a prison grievance about Dr. Montegrande. (*See* SER-31 (grievance, asserting the supplies were terminated "effective September 16"), SER-44–46 (grievance, asserting that "Ms. Jennifer Chungafu" discontinued the supplies on September 10).)

## V. AFTER CONSULTING WITH MEDICAL, THE PRISON'S REASONABLE ACCOMMODATION PANEL APPROVED ADOM'S ACCOMMODATION REQUEST IN PART.

A week after his ophthalmology follow-up appointment with Dr. Montegrande, Adom submitted an accommodation request to the Reasonable

14

Accommodation Panel (RAP). (ER-137.) The accommodation request form directs inmates to identify the access issue for which they are requesting accommodation, explain why they are having the issue, and identify the accommodation sought. (ER-132–33, 137.) The panel considers the inmate's request and other evidence, including the medical record and prison file, and the opinions of subject-matter experts. (ER-133.) The panel works with medical providers to determine whether an accommodation is medically appropriate, including helping verify the claimed disability or identify associated limitations. (*Id.*)

Adom's stated that he had been receiving diapers for a few months but was not issued the last weekly supply and asked for diapers and access to laundry services to exchange soiled linens, or alternatively, towels, trash bags, and sanitary items. (ER-137.) While the request was pending consideration, medical staff noted that Adom had no documented diagnosis or finding of medical necessity. (ER-162, 165, 225; *see also* ER-139–40.) So, medical staff scheduled a primary-care appointment for Adom to discuss the matter with a doctor.

The panel that considered Adom's accommodation request consisted of five medical and custody personnel, including the prison's ADA Coordinator (Mojica). (ER-132, 136.) The ADA coordinator was responsible for ensuring that the panel considered and responded to Adom's accommodation request, which occurred

15

here. (ER-134, 136.) Because incontinence is a medical issue, the ADA
Coordinator deferred to the medical team. (ER-134.)

After reviewing Adom's request and medical records and consulting with
subject matter experts, the panel approved a modified accommodation. (ER-136.)
Since medical staff had determined that incontinence supplies were not medically
necessary, the panel authorized an alternate accommodation: if an incontinence
episode occurred, housing officers would discreetly log the incident, provide
access to a shower, and exchange any soiled clothing or linens for fresh supplies.
(*Id.*) Adom presumably utilized this accommodation because he never complained
about not receiving the modified accommodation. (AOB 10.)

Adom appealed the decision, stating only he was "dissatisfied" with the "RAP
Decision" without explaining why the modified accommodation was insufficient.
(ER-100.) Neither Adom's accommodation request nor his appeal indicated that
the episodes of incontinence were occurring regularly, or that they exacerbated his
back pain when they occurred at night. (ER-100, 137.)

This modified accommodation remained in effect until, as discussed *infra*, a
medical examination revealed that Adom's prostate was enlarged, and his doctor
determined that incontinence supplies were medically indicated and authorized
them. (ER-46, 248.)

## VI. WARDEN ATCHLEY DELEGATED INMATE LETTERS TO HIS STAFF FOR INVESTIGATION AND RESPONSE.

Warden Atchley did not interact with Adom directly, nor was aware of Adom's letter. (ER-112, SER-63, 67–68). The Warden's Office receives up to 20 letters from inmates daily, and Warden Atchley delegates responsibility for reviewing, investigating, and responding to these letters to staff. (SER-68.)

Further, because Atchley's authority, policymaking, and expertise are limited to custody issues and do not encompass incontinence accommodations, he deferred to medical staff's determinations regarding whether incontinence supplies were medically indicated. (SER-67–68.)

A week after Adom wrote to the Warden's Office, a sergeant responded. (SER-63.) Adom assumed the sergeant was responding on Atchley's behalf because he referenced Adom's letter. (SER-65.) Custody staff can distribute incontinence supplies at the direction of medical staff, but they lack authority to intervene in medical decisions or provide medical accommodations that have not been authorized, including the provision of diapers and other incontinence supplies. (SER-64, 68.) Cal. Code Regs. tit. 15 § 3999.394(d) (authorizing prison doctors to initiate accommodation requests "based on medical necessity."). When the sergeant advised Adom of this, Adom requested towels, plastic, tape, and sanitary provisions. (2-SER-63–64; ER-186.) The sergeant supplied clean towels

17

and boxers but did not have the other items Adom requested. (ER-186; SER-63–64.)

## VII. DR. LADD FOUND NO CLEAR MEDICAL INDICATION FOR INCONTINENCE SUPPLIES BUT TREATED ADOM'S COMPLAINTS OF URINARY INCONTINENCE WITH A TRIAL OF OXYBUTYNIN.

Adom requested incontinence supplies at his December 7, 2021 appointment with Dr. Ladd. (ER-43, 153, 250.) Dr. Ladd explained that because incontinence supplies are tightly controlled in prison, he could not prescribe them without a clear medical indication. (ER-35, 37, 156, 165.) Dr. Ladd also reviewed Adom's medical history and found no clear indication for incontinence supplies. (ER-35, 37, 165; *see also* ER-158 (Adom's deposition testimony agreeing that prison doctors "need to have some sort of medical history or some sort of objective data" before authorizing incontinence supplies).) Dr. Ladd prescribed a trial treatment with oxybutynin for Adom's incontinence concerns. (ER-35, 37, 147, 156, 165.) However, a few weeks later the medication was discontinued due to side effects. (ER-46.)

## VIII. INCONTINENCE SUPPLIES WERE FOUND TO BE MEDICALLY INDICATED AFTER ADOM WAS DIAGNOSED WITH AN ENLARGED PROSTATE.

On December 29, 2021, CDCR's Chief Physician for Telemedicine Dr. Lotersztain visited Salinas Valley State Prison during the last week of December 2021 to help with patient care. (ER-130–31.) One of those patients was

Adom, whom Dr. Lotersztain examined on December 29, 2021. (ER-131.) At the time, Adom's history of incontinence was vague, traced back only a year, and the cause was unclear. (*Id.* (also noting Adom's report that he could control his urination while awake and the incontinence happened while sleeping).) Adom requested incontinence protections "primarily for overnight protection" due to the back pain he experienced when getting up at night after an episode of urinary incontinence. (ER-160, 187.) While Adom had chronic back pain, this was the first time he linked complaints of pain to incontinence. (*Id.*)

With Adom's consent, Dr. Lotersztain performed a prostate exam. (ER-131; SER 8–9.) While Adom's laboratory results were normal, Dr. Lotersztain performed the prostate exam to check for Benign Prostatic Hypertrophy (prostate enlargement). (ER-131.) The exam showed a mildly enlarged and indurated prostate, so Dr. Lotersztain prescribed Tamsulosin (Flomax). (ER-131.) She also ordered a urine culture to rule out infection and placed an order for diapers marked as "high priority." (*Id.*)

While Dr. Lotersztain was not responsible for issuing incontinence supplies (ER-130–31), the record shows Adom has continually received incontinence supplies since January 20, 2022. (*See* ER-54–55 (accommodation was ongoing at the time of June 2023 deposition), ER-187; SER-61 (identifying only one interruption, when a stabbing occurred).)

19

## IX. CHIEF EXECUTIVE OFFICER SAWYER CONDUCTED AN ADMINISTRATIVE REVIEW OF ADOM'S GRIEVANCES.

Chief Executive Officer Sawyer is a prison administrator responsible for conducting a supervisory review of prisoner healthcare grievances at the institutional level. (SER-10.) She is not a doctor and cannot diagnose patients, make treatment decisions, or determine whether a prisoner is medically eligible for a particular treatment. (*Id.*) Sawyer did not interact with Adom or receive any letter from him. (*Id.*) Rather, she conducted an administrative review of Adom's three grievances months after the medical appointment at issue. (SER-19–21, 33–35, 48–49; *cf.* AOB 9 (asserting Adom received a grievance response on September 29 but citing ER-236, which is the October 14 RAP response [see bottom right corner] that followed the panel's September 29 meeting).)

Adom's first grievance (SVSP-HC-21001578) concerned his ophthalmology follow-up visit with Dr. Montegrande and his interactions with a nonparty nurse before the appointment. (SER-15, 17.) The grievance complained that Dr. Montegrande had "BOMBOARD[ED]" him with questions about his stroke and wheelchair use and had "pushed down when [he] was not expecting" it during the strength test, such that his resistance exacerbated his back pain and his heel slammed into the wheelchair footrest. (*Id.*) Adom did not indicate he had sustained any injury to his arm or experienced incontinence during the exam. (*Id.*) The grievance also recounted Adom's conversation with the nurse who "didn't handle

20

[incontinence] supplies," and reported that when he asked Dr. Montegrande "if [he] could speak with her about [his] incontinence supplies" he was told that the appointment was only for an ophthalmology follow-up. (*Id.*)

Sawyer's response noted that Dr. Montegrande had resolved Adom's concern about his eye medication and ordered a follow-up ophthalmology appointment. (SER-20.) Sawyer also addressed Adom's complaint that he had been unable to address incontinence supplies at the appointment, noting that a nurse had subsequently explained to him that an active primary-care order was required for incontinence supplies and he did not have one, and a medical file review found no diagnosis requiring incontinence supplies. (SER-19–20.) Since Adom was receiving the care his providers determined was medically indicated, Sawyer determined that no intervention was necessary. (*Id.*)

Adom appealed the decision, stating only that he disagreed with the response because it did not include intervention or monetary compensation. (SER-16.) The Headquarters' level response also determined that no intervention was necessary because Adom was receiving the treatment his doctors deemed medically necessary and, by then, incontinence supplies had been authorized and Adom had no concerns at his last pick-up. (SER-13–14.)

Adom's second grievance (SVSP-HC-21001617) complained that his incontinence supplies had been terminated "effective September 16, 2021," and he

21

could not function without them. (SER-31 (cleaned up).) While Sawyer saw no active order for supplies or diagnosis that required them, she noted Adom had a primary-care appointment scheduled to ensure he could address any need for accommodation with his doctor. (SER-33–35.) Given that appointment and that Adom was receiving care from various treating doctors, Sawyer determined that no intervention was necessary. (*Id.*)

Adom again appealed to merely express his disagreement with the response. (SER-30.) The Headquarters' level decision found that no intervention was necessary because Adom had already addressed his concerns with his doctor, incontinence supplies had been authorized, and that authorization was still in effect. (SER-26–27, 29, 31.)

Adom's third grievance (SVSP-HC-21001725) asserted that on September 10, 2021, a "Ms. Jennifer Chungafu" had, among other things, canceled his order for incontinence supplies. (SER-44–46.) Sawyer reviewed the grievance in December, the week after Adom's appointment with Dr. Ladd. (SER-48–49.) Relevant here, Sawyer noted that Dr. Ladd prescribed a trial of oxybutynin but opined that diapers were not medically necessary, and although the medication was subsequently terminated due to side effects, Adom already was scheduled for a follow-up appointment. (*Id.*) On these facts, Sawyer found that no intervention was necessary. (*Id.*)

Adom appealed with another boilerplate statement seeking review. (SER-40–41, *cf.* SER-16, 30.) The Headquarters' level reviewer noted that the incontinence accommodation had already been addressed in Adom's second grievance, and that Adom was receiving incontinence supplies. (SER-40–41.)

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo. Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1097–98 (9th Cir. 2000). Mootness and standing are related questions of law, also subject to *de novo* review. *Id.* This Court can affirm on any ground supported by the record. *Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 973 (9th Cir. 2017).

## SUMMARY OF THE ARGUMENT

Dr. Montegrande did not violate the Eighth Amendment. She examined Adom once only to discuss the treatment he received from an outside ophthalmologist, and Adom admits that his incontinence was not addressed at this appointment. There is no evidence that Dr. Montegrande interfered with Adom's incontinence accommodation or otherwise disregarded any substantial risk of serious harm to him during the examination. Adom's claim that Dr. Montegrande conducted "forceful" strength and reflex testing during an exam that necessarily entails physical testing of extremities does not show the intentional and wanton infliction of pain that categorizes Eighth Amendment violations. (AOB 8.) Adom's

also did not show that more than de minimis force was used. Thus, the district court properly entered summary judgment. Additionally, Dr. Montegrande is qualifiedly immune because the treatment she provided did not violate clearly established Eighth Amendment law.

Adom's ADA claim also fails. The ADA prohibits discrimination because of disability; it does not provide a remedy for alleged deficient treatment. Adom was initially excluded from the prison's Durable Medical Equipment program because no medical professional had diagnosed him with an underlying medical condition that would make incontinence supplies medically necessary for him. Even then, the prison provided a modified accommodation to help with his incontinence issues. Once Adom alerted medical that he was experiencing pain due to his incontinence, a prostate exam was performed that led to an enlarged prostate diagnosis. Since that diagnosis, Adom has continuously received incontinence supplies for his medical condition. Thus, Adom's claim that he went without incontinence supplies for several months pending a diagnosis amounts only to a delay in treatment, which is inactionable under the ADA. On appeal, Adom raises new claims about prison toileting and hygiene services, but these claims fail on waiver grounds and the merits.

Additionally, Adom's ADA claim for damages failed because he did not show deliberate indifference. And he did not have standing to bring an injunctive

24

claim because, following his enlarged prostate diagnosis, Adom continuously received incontinence supplies for nearly a year before he brought suit and did not present evidence of interrupted access to them post-suit.

This Court should affirm the judgment.

## ARGUMENT

### I. NO EIGHTH AMENDMENT VIOLATION OCCURRED.

#### A. Eighth Amendment Legal Standard.

To establish an Eighth Amendment violation based on medical care, a prisoner must show that the chosen course of treatment was both "medically unacceptable under the circumstances" and was "chosen in conscious disregard of an excessive risk" to his health. *Toguchi v. Chung*, 391 F.3d 1051, 1057-58 (9th Cir. 2004) (cleaned up).

Because society does not expect that prisoners will have unfettered access to healthcare, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious." *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992); *Wood v. Housewright*, 900 F.2d 1332, 1334–35 (9th Cir. 1990) (when a delay in care is asserted, the deprivation must cause "substantial harm.").

"Deliberate indifference is a high legal standard." *Toguchi*, 391 F.3d at 1057. Each defendant must both be subjectively "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must

25

also draw the inference." *Id.* (cleaned up). If the defendant should have been aware of the risk but was not, she "has not violated the Eighth Amendment, no matter how severe the risk." *Id.* Under this standard, an inadvertent failure to provide adequate medical care, differences of opinion in medical treatment, and harmless treatment delays are insufficient to sustain an Eighth Amendment claim." *Toguchi*, 391 F.3d at 1060; *Wood*, 900 at 1332, 1334–35 (9th Cir. 1990) (requiring "more than mere negligence or isolated occurrences of neglect.").

**B.    Dr. Montegrande Did Not Violate the Eighth Amendment.**

    **1.    Dr. Montegrande's strength and reflex examination constituted at most de minimis force and was not motivated by evil intent to cause harm.**

Dr. Montegrande's strength and reflex examination, which necessarily entails physically testing Adom's extremities, did not violate the Eighth Amendment. The circumstances, nature, and duration of an asserted deprivation are critical when determining whether conduct is grave enough to form the basis of an Eighth Amendment claim. *Simmons v. G. Arnett*, 47 F.4th 927, 933 (9th Cir. 2022); *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2006). "[C]onduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). No such showing was made here.

26

While Adom recounts an examination that was roughly conducted, nothing in the record suggests that the standard strength and reflex examination was medically unacceptable or contraindicated here, that Dr. Montegrande exercised more than an ordinary lack of due care when conducting it, or that she intended to harm Adom. (*See, e.g.,* ER-182–84, SER-14, 17.)

The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis physical force when, as here, the type of force used is not of a sort repugnant to the conscience of mankind. *Hudson v. McMillian,* 503 U.S. l, 9 (1992). Adom at most experienced temporary pain or discomfort during the brief examination and sustained minor abrasions that did not require medical treatment. (ER-60, 182–84.) Thus, the force employed when conducting the exam did not exceed the de minimis threshold, and it is insufficient to show an Eighth Amendment violation. *See Oliver v. Keller*, 289 F.3d 623, 627–29 (9th Cir. 2002) (back and leg pain from sitting on cement floor overnight and a painful canker sore were de minimis); *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1224 (9th Cir. 2008) (paraplegic inmate's bed sores and recurrent bladder infections were not de minimis).

The district court did not disregard Adom's testimony describing the exam or resolve any material dispute in Dr. Montegrande's favor — it simply found that Adom's version of events did not amount to a constitutional violation. (AOB 45;

ER-10.) Notably, Adom did not allege that he told Dr. Montegrande to stop the strength and reflex exam after experiencing pain, and indeed he continued with the exam despite it. (ER-182–84; SER-8.) Adom also does not dispute that the strength and reflex exam necessarily entails physically testing his extremities and reflexes. Thus, Adom's description of the exam, however forceful, did not show that Dr. Montegrande performed the exam wantonly simply to inflict pain.

> **2.** **Dr. Montegrande cannot be vicariously liable for other personnel's responses to Adom's complaints of urinary incontinence.**

Dr. Montegrande is liable only for her own conduct. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (considering each defendants' duties, discretion, and means); *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978). During her only examination of Adom for an unrelated eye issue, she did not interfere with Adom's incontinence accommodation. (ER-139.) Although other medical personnel initially terminated the accommodation based on the lack of a medical diagnosis or a finding of medical necessity (ER-96, 139, 166, 180, 231, 255; AOB 5), Dr. Montegrande was not involved in that decision. Indeed, Adom admitted that the examination with Dr. Montegrande was not intended to address his incontinence issues but rather to discuss the treatment notes from his then-recent visit with an outside ophthalmologist. (ER-124, 182.)

Multiple medical assessments found that Adom did not have a substantially serious medical need for incontinence supplies at that time — including the medical review that discontinued the accommodation, the RAP panel's review, Dr. Ladd's assessment, and the reviews detailed in the grievance responses. (ER-35–37, 162, 165, 225, 236.) Moreover, the undisputed evidence shows that Dr. Montegrande was not the person designated to distribute incontinence supplies or process accommodation inquiries. (ER-139, 181–82.)

The prison provided two established avenues for prisoners to raise such concerns: healthcare service requests and disability accommodation requests. Cal. Code Regs. tit. 15 § 3999.394(c). Adom undeniably utilized those procedures to raise the incontinence issues, obtain alternative accommodations, and secure a medical diagnosis that led to his enrollment in the Durable Medical Equipment program. (ER-33–36, 96–97, 131, 136–37; SER 15, 17, 31, 44–46.) And Adom testified that he made his own incontinence supplies during the period at issue, which "provided … the urinary protections that [he] needed." (ER-152, 159, 160.)

At most, Adom established that Dr. Montegrande overlooked or ignored a single daytime episode of urinary incontinence, which did not pose a substantial risk of serious harm to him. (ER-160 (only injury was the back pain experienced when "having to get up at night" following an episode), ER-167 (exposure to urine poses no risk).) Thus, even if Adom "asked … about getting a diaper" (ER-183) or

requested "to speak with her regarding … incontinen[ce] supplies" (SER-17), Dr. Montegrande would not have known that Adom had used up his last supply of diapers or that he could not obtain more from the person designated for distributing incontinence supplies because it is undisputed that she did not "examine[], evaluate[], interview[] or question[]" him about his incontinence. (ER-124, *see also* ER-30, 32, 44–45, 122.) *See also Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1314 (9th Cir.) (finding lack of sanitation must be sufficiently severe and prolonged), *opinion amended on denial of reh'g*, 75 F.3d 448 (9th Cir. 1995).

Further, Adom did not show that an impromptu examination could have been conducted into his incontinence complaints at the ophthalmology follow-up appointment. (AOB 45–46). Even assuming time permitted — which has not been shown here — Adom's mobility was limited and the small examination room did not have an examination table. (ER-182; *cf.* ER-131 (prostate examination conducted by Dr. Lotersztain before reinstating accommodation).)

On this record, no reasonable jury could find that Dr. Montegrande was "both … aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and … also dr[e]w the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Accordingly, Adom failed to demonstrate an Eighth Amendment violation.

### 3. Adom's remaining arguments lack merit.

Adom's reliance on *Spruill* is misplaced. (AOB 43, citing *Spruill v. Gillis*, 372 F.3d 218, 237 (3d Cir. 2004).) The allegations of deliberate indifference in *Spruill* are very different from the summary judgment evidence here. There, the Third Circuit held that the plaintiff pleaded a deliberate indifference based on allegations that he fell and hit his head after doctors repeatedly refused to treat his chronic and debilitating back disorder, the deficient care created a risk of permanent disability or fatal injury, and when the doctors finally saw him, they intentionally inflicted pain by twisting his legs "as if … trying to shape a pretzel" even though he repeatedly stated that the examination was causing him pain. *Id.*

In contrast, the evidence here shows that Adom saw Dr. Montegrande only once, conducted a competent ophthalmology follow-up examination and addressed his concerns, purportedly conducted a forceful strength exam causing pain and abrasions that did not require medical attention, and did not attend to an episode of incontinence that posed no risk of harm. (ER-60, 139, 167, 184.) Whether Dr. Montegrande documented the strength examination is beside the point (AOB 43) because the undisputed evidence shows that she was not required to do so (ER-139), and regardless, she must assume Adom's version of events to argue that the claim failed as a matter of law.

Adom's citation to the pre-2007 unpublished *Banks* case is inappropriate and misplaced. (AOB 42, citing *Banks v. Hayward*, 216 F.3d 1082, 2000 WL 491696 (Table), *3-4 (9th Cir. 2000).) Ninth Circuit Rule 36-3 prohibits citations to pre-2007 unpublished cases like *Banks*. Regardless, *Banks* is inapposite. There, the plaintiff claimed that after he was discharged from a hospital to the prison infirmary, the deep stab wound in his chest reopened and began bleeding. *Banks*, 2000 WL 491696 at *3-4. Despite being in serious pain and repeatedly requesting painkillers and clean bandages while in the infirmary, the defendants refused to treat him. *Id.* On these facts, *Banks* held, "if Banks was denied painkillers for non-medical reasons while suffering serious pain, the denial *may* constitute the "wanton and unnecessary infliction of pain." (*Id.* (emphasis added).) To that end, Adom overstates this holding when he cites *Banks* for the proposition that "[t]he intentional infliction of pain for nonmedical reasons demonstrates deliberate indifference." (*Compare* AOB 42–43 *with Banks*, 2000 WL 491696, *3-4.)

In any event, Dr. Montegrande did not deny treatment, or conduct the strength and reflex examination, for nonmedical reasons. (*See* ER-139.) Rather, the undisputed evidence establishes that the strength and reflex examination was a standard examination. (*Id.*) Adom's bare speculation and argument asserting otherwise "are not evidence" and "[cannot] create fact issues capable of defeating an otherwise valid motion for summary judgment." *Smith v. Mack Trucks, Inc.*,

32

505 F.2d 1248, 1249 (1974) (legal argument); *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 60 F. 3d 337, 345 (9th Cir. 1995) (speculation). Thus, Adom cannot establish that the exam — which tests for muscle strength, balance, and neurologic deficits[9] — was not medically indicated based on speculation and argument alone. (*See also* ER-180, 241 (showing Adom's wheelchair use and history of stroke).)

Since Adom's speculation and personal opinions regarding Dr. Montegrande's reasons for conducting the strength and reflex exams would not be admissible at trial, a reasonable trier of fact would have no evidence upon which to find those asserted facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002) (only qualified experts can testify as to matters that require scientific or specialized knowledge). Thus, the testimony must be disregarded.

As the plaintiff, it was Adom's burden to provide competent evidence sufficient to show a genuine dispute. *Soto v. Sweetman, 882 F.3d 865*, 872 (9th

---

[9] Naqvi U, Sherman AL. *Muscle Strength Grading*, *available at* https://www.ncbi.nlm.nih.gov/books/NBK436008/ ("Muscle strength testing is an important component of the physical exam that can reveal information about neurologic deficits.") (last accessed February 27, 2025); Sears, B. *Purpose and Methods of Muscle Strength Grading*, *available at* https://www.verywellhealth.com/muscle-strength-measurement-2696427 (including stroke).

Cir. 2018). Since he failed to do so, the district court properly granted summary judgment to Dr. Montegrande.

## II. DR. MONTEGRANDE IS QUALIFIEDLY IMMUNE BECAUSE SHE DID NOT VIOLATE CLEARLY ESTABLISHED EIGHTH AMENDMENT LAW.

This Court can affirm the judgment on the additional ground that Dr. Montegrande is qualifiedly immune. *Bibeau v. Pac. Nw. Research Found. Inc*., 188 F.3d 1105, 1111 n.5 (9th Cir. 1999) (deciding qualified immunity in the first instance, in the interest of judicial economy); *Shoshone-Bannock Tribes v. Fish & Game Comm'n*, 42 F.3d 1278, 1285 (9th Cir. 1994) (this Court "will decide an issue of law avoided by the district court where it becomes dispositive on appeal if [it is] equipped to do so").

"Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004). Qualified immunity shields prison officials from liability unless their conduct violates clearly established rights that every reasonable person would have known. *Saucier v. Katz*, 533 U.S. 194, 205-06 (2001). Thus, existing precedent must have placed the constitutional question beyond debate. *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011). This standard leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (cleaned up).

To establish a violation of clearly established law, Adom must point to controlling precedent that articulates a constitutional rule, specific to the context of this case, sufficient to alert Dr. Montegrande that her conduct violated the Eighth Amendment. *Hamby v. Hammond, 821 F.3d.* 1085, 1091 (9th Cir. 2016); *Sharp v. Cty. of Orange,* 871 F.3d 901, 911 (9th Cir. 2017) (requiring controlling precedent or a consensus of courts outside the jurisdiction). No such precedent exists, and as explained *supra*, the circumstances surrounding the exam are plainly distinguishable from the Eighth Amendment cases Adom cites in his opening brief. (AOB 42–43.) Indeed, how Dr. Montegrande performed the strength examination, as recounted by Adom (ER-182–84), did not even exceed the Eighth Amendment's de minimis threshold, *see Hudson,* 503 U.S. at 9.

Adom's incontinence allegations fare no better: while Adom's urinary incontinence may have been embarrassing and unpleasant, there is no evidence that it posed any serious risk, or that Dr. Montegrande was aware of any such risk. (ER-139, 181–82.) And certainly, Adom cites no controlling precedent that places the illegality of Dr. Montegrande's conduct beyond debate to deny her qualified immunity.

Dr. Montegrande is entitled to qualified immunity.

### III. NO ADA VIOLATION OCCURRED.

### A. ADA Legal Standard.

Adom also cannot establish liability by couching his claim in disability discrimination terms, because the record does not show that he was excluded or discriminated against by reason of his disability. The ADA "prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) (overruled on other grounds by *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)); 42 U.S.C. § 12132.

To establish a violation, a plaintiff must show: "(1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of [his] disability." *McGary v. City of Portland,* 386 F.3d 1259, 1265 (9th Cir. 2004) (cleaned up); *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007).

Medical treatment choices cannot form the basis of an ADA claim because "the ADA does not create a remedy for medical malpractice." *Simmons*, 609 F.3d at 1022 (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)).

36

**B.    Adom Failed to Demonstrate an ADA Violation.**

    **1.    A "disability" under the ADA is measured by the impairment imposed on major life activities.**

Merely having an impairment is not sufficient to qualify as disabled under the ADA. 42 U.S.C. § 12102(2)(A). Rather, "disability" is a carefully defined term of art that is not measured by reference to formal diagnoses but by reference to limitations on major life activities. *Id*.; *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999) (Title I); *Amyette v. Providence Health Sys.*, 388 F. App'x 606, 607 (9th Cir. 2010). Individuals claiming the Act's protection must prove their disability by offering evidence in terms of their own experience that show the extent of the limitation is substantial. *Albertson's*, 527 U.S. at 567; *Hall v. Higgins*, 77 F.4th 1171, 1182 (8th Cir. 2023) (holding that only a "known disability triggers the duty to reasonably accommodate."); *Shaw v. Kemper*, 52 F.4th 331, 332–33 (7th Cir. 2022) (incontinent wheelchair user had qualifying disability where he defecated on himself three times, in one instance after dragging himself 180 feet, because the only handicapped toilet was unavailable).

While Adom acknowledges that qualifying disabilities are measured by reference to limitations on major life activities, he provides little more than a laundry list of diagnoses to argue that his mobility impairment and incontinence suffice to qualify as a disability under the ADA. (AOB 18–19.) But the record predating Adom's December 29 appointment that restored his authorization for

incontinence supplies is largely silent as to the extent of the limitations Adom experienced. While Adom *argues* that he "routinely" experienced incontinence throughout the period at issue, his statements to prison staff were vague and conclusory, did not describe the incidents as frequently occurring, and did not describe any substantial impairment or indicate that the back pain he experienced at night contributed to the need for incontinence supplies as an accommodation. (*See* ER-96, 137, *see also* ER-131 ("he reported that he was able to urinate while awake and the incontinence happened in his dreams"); *Cf.* ER-187.) Thus, Adom failed to demonstrate a qualifying disability.

### 2. Adom was not "otherwise qualified" to participate in the prison service at issue.

Adom's ADA claim fails because it is grounded in his contention that he was *denied treatment for his incontinence*, not that he was excluded from a prison service that he was "otherwise qualified" to receive.

To demonstrate an ADA violation, Adom had to show that he was excluded from existing programs that were available to other prisoners and, aside from his asserted disability, he was "otherwise qualified to participate in or receive the benefit" of the program at issue. *McGary,* 386 F.3d at 1265. Thus, the ADA is not violated when the plaintiff's disability is the only factor that qualifies him to receive the service. *Id.*; *see also O'Guinn v. Nev. Dep't of Corr.*, 468 Fed. App'x. 651, 653 (9th Cir. 2012) (explaining that where plaintiff asserted a failure to

38

provide mental-health treatment for his mental-health disability he was not "otherwise qualified" to receive the treatment, so the ADA did not apply).

Adom's complaint and summary-judgment opposition asserted that he was initially excluded from the prison's Durable Medical Equipment program, which provides diapers and other incontinence supplies. (ER-7–9, 191–96.) Since Adom's asserted incontinence disability is the only factor that would plausibly qualify him to receive incontinence supplies through the program, he was not "otherwise qualified" to receive the accommodation. *See O'Guinn*, 468 Fed. App'x. at 653 (citing *United States v. Univ. Hosp., State Univ. of New York at Stony Brook*, 729 F.2d 144, 157 (2d Cir. 1984)).

Since Adom failed to establish that he was "otherwise qualified" to receive incontinence supplies through the Durable Medical Equipment program, he cannot prove an ADA violation.

### 3. Adom was not excluded from prison services "because of" his disability.

Adom's ADA claim fails also because he was not excluded or otherwise discriminated against by reason of his disability, which he identifies as his incontinence. (ER-192, 194–95.) *McGary,* 386 F.3d at 1265. The ADA prohibits disability discrimination, but it does not provide a remedy for claims concerning "inadequate treatment for disability." *Simmons*, 609 F.3d at 1022.

39

Adom's initial authorization for incontinence supplies was not revoked because he was incontinent; it was revoked because a medical review revealed that he had no active diagnosis that affected his bladder or bowel control, and his medical file contained no corroborating data or information showing a medical need for incontinence supplies. (ER-96, 139, 166, 180, 231, 255; AOB 5.)

Likewise, when Adom sought to have the accommodation reinstated, he was directed to identify the access issue for which he was requesting accommodation and explain why he was having the issue. (ER-137, *see also* ER-132–33.) Adom asserted only that he "[could not] completely control his urine" and at times found stool in his diaper. (ER-137.) He did not describe a problem that was regular or frequent or indicate that the back pain he experienced at night contributed to his need for accommodation. (*Id.*) The RAP investigated, consulted appropriate experts, and found no diagnosis or determination of medical necessity to support the provision of incontinence supplies. (ER-132–33, 136.) And when the panel approved the modified accommodation that included showers and clean clothing and linens, Adom did not explain why the accommodation was insufficient for his particular disability. *Hall*, 77 F.4th at 1182 (holding that only a "known disability triggers the duty to reasonably accommodate.").

Adom received a modified accommodation based on his medical needs, which included a standing authorization to access the shower and obtain clean

clothing and linens each time an incontinence incident occurred. And Adom underwent subsequent medical assessments with similar results. (ER-35–37, 139, 166, 231.) Adom's argument — that the record does not show that he actually received the modified accommodation — is misplaced. (AOB 10, 29–31.) Competent evidence is required to dispute whether showers and laundry access were actually provided pursuant to the modified accommodation. *See Soremekun v. Thrifty Payless*, 509 F.3d 978, 984 (2007); *Soto*, 882 F.3d at 872. His *silence* about the modified accommodation is not proof that he did not actually receive it but rather an implicit admission that he had no beef with it.

Adom incorrectly argues that the district court misapplied the ADA's meaningful access mandate. (AOB 27–28.) This mandate requires that public entities provide disabled plaintiffs equal access to public services. *See also Tennessee v. Lane,* 541 U.S. 509, 513 (2004) (explaining that access was not meaningful where paraplegic plaintiff had to crawl up steps to reach the court). The district court did not misapply this mandate to hold that "any accommodation at all absolved CDCR" of liability. (AOB 28 (citing ER-12).) Rather, the court found that the reason the CDCR did not provide incontinence supplies during the period at issue "was that medical professionals determined he did not have a medical need for them, not because Defendants were deliberately discriminating against him due to his incontinence." (ER-12.)

When the court recounted the host of accommodations and treatment Adom was provided, it was not misapplying the ADA's meaningful access mandate; rather, it was explaining why the evidence showed at most a disagreement about treatment and not the deliberate exclusion needed to support a claim for monetary damages. (ER-12; AOB 29.)

Adom was provided the accommodations found to be medically necessary and was not excluded from receiving incontinence supplies because he was incontinent.

### 4. Adom's newly asserted toileting and hygiene claims fail.

#### a. Adom waived any challenge concerning his purported exclusion from prison hygiene and toileting services by failing to raise these claims in the district court.

Adom waived any challenge concerning the prison's hygiene and toileting services because no such claim was asserted below. *Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104, 1112 n.2 (9th Cir. 2001) (courts generally will not consider claims not plead in the complaint); *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989) (an argument must be "raised sufficiently for the trial court to rule on it.").

In the district court, Adom asserted only that he was initially excluded from the prison's Durable Medical Equipment program, which provides diapers and other incontinence supplies. (ER-192, 194–95, *see also* ER-7–9, 71–73.) He never indicated that the asserted lack of diapers caused his exclusion from other prison

42

programs or services. (*Id.*) Perhaps recognizing that the denial of incontinence supplies litigated below is not cognizable under the ADA, the opening brief attempts to re-frame this claim as a denial of access to prison toileting and hygiene services. (AOB 16–21, 27–31.) However, Adom waived these claims by failing to plead them in the complaint or litigate them in the district court.

      **b.**    **Should this Court consider Adom's new prison toileting and hygiene services claims, no ADA violation occurred.**

Waiver aside, Adom's new toileting and hygiene services claims fail because — in addition to the deficiencies outlined above — they are not supported by competent evidence.

The opening brief's bare assertion that Adom was excluded from prison toileting and hygiene services (*see, e.g.,* AOB 19–20) falls short of establishing an ADA violation. *Soto*, 882 F.3d at 872 (requiring "competent evidence"); *Smith*, 505 F.2d at 1249 (legal argument is "not evidence" and cannot create a factual dispute).

Whether the ADA guarantees access to "toileting services" is inapposite. (AOB 19–20.) Nothing in the record suggests that Adom's ability to access prison toilet facilities was limited. *Cf. Barker v. Osemwingie*, No. 20-15503, 2021 WL 5564625, at *1 (9th Cir. Nov. 29, 2021) (holding that transferring an inmate from a wheelchair to the toilet is an accommodation that provides access to toileting

43

services). This litigation concerns uncontrolled urinations, which, by their nature, typically do not involve toilet facilities. And Adom had a commode chair in his cell. (ER-81.) Likewise, the availability of diapers, because of their intended function, also does not impact toilet access.[10] (*See* ER-151 (conceding diapers do not cure incontinence).)

Moreover, Adom's admission that *his incontinence*, as opposed to a prison service, precluded him from using prison toilet facilities (AOB 21, 37), dooms his claims. While the ADA precludes public entities from establishing barriers that prevent disabled inmates from accessing prison services on the same basis as other nondisabled inmates, it does not require prisons to level the playing field by completely eliminating any potential disadvantage that the disability creates. *See, e.g. Simmons*, 609 F.3d at 1022 (holding that the ADA "prohibits discrimination because of disability, not inadequate treatment for disability.").

Whether the ADA guarantees access to "hygiene services" also is inapposite. (AOB 20–21, 29–34.) The evidence here shows that Adom had the same access to hygiene services as other prisoners, because his incontinence did not prevent him from using prison sinks, showers, or laundry facilities, or requesting hygiene

---

[10] To the extent Adom intended "toileting services" to refer to the ability to control his need to urinate or the prison's provision of incontinence supplies, then this claim necessarily fails for the reasons explained in Argument Section III.B.2, because Adom was not "otherwise qualified" to receive the accommodation. *See O'Guinn*, 468 Fed. App'x. at 653.

supplies from custody staff. *See* Cal. Code Regs. tit. 15, § 3999.393(a)(1). To the

contrary, the accommodations provided to Adom provided additional access to

hygiene services — he was given extra clean towels and boxers (ER-196) and was

authorized to receive showers and fresh clothing and linens each time an

incontinence episode occurred (ER-136.)

To the extent Adom asserts that his chronic pain made it difficult to manage

his hygiene (AOB 21, 37), the evidence shows this only happened at night (ER-

160–61) and he failed to notify prison officials of that this was part of the issue that

required accommodation. (ER-132–33, 137.) *Hall*, 77 F.4th at 1182.

Accordingly, Adom's new toileting and hygiene ADA claims fail.

### 5. Adom's reliance on *Munoz* and other case law is misplaced.

Adom's reliance on *Munoz v. California Department of Corrections and*

*Rehabilitation*, 842 F. App'x 59, 62 (9th Cir. 2021), is misplaced. (AOB 24-25, 35-

36.) The *Munoz* plaintiff established a triable dispute regarding whether the

defendant doctor who reversed his low-bunk chrono had conducted an adequate

fact-specific inquiry into his disability, where the doctor never examined or

interviewed him, and based his determination on the same medical records that

prior doctors had used to grant the accommodation. *Munoz,* 842 F. App'x 59.

While Adom contends that his authorization for incontinence supplies was

also terminated without an individualized assessment, he failed to support this

contention with competent evidence. *Soto*, 882 F.3d at 872. Since the record here is silent regarding who terminated the authorization, there is no evidence on which to infer that the person responsible had never assessed Adom's condition or was not involved in his treatment. *Anderson*, 477 U.S. at 252. (ER-139.)

Moreover, as shown above, Adom's ability to access incontinence supplies does not qualify for protection under the ADA, so he could have no entitlement under the ADA to further assessment before the accommodation is terminated.

The unpublished cases on which Adom relies fare no better. (AOB 36 (citing *Morris v. California*, No. 21-16059, 2022 WL 2901730, at *1 (9th Cir. 2022) and *Pamplin v. Lucas*, No. 22-15284, 2023 WL 3478412, at *2 (9th Cir. May 16, 2023).) These cases concern dismissals at the pleading stage where the plaintiffs had disabilities affecting mobility and could potentially plead facts showing that they were excluded from prison programs or services they otherwise qualified for. No such showing was made here.

Adom failed to demonstrate a triable dispute under the ADA.

**C.    Adom's Claim for Monetary Damages Under the ADA Fails Because he Did Not Establish the Requisite Discriminatory Intent.**

Adom's claim for monetary damages fails. Monetary damages are not available under Title II of the ADA absent a showing of discriminatory intent, which has not been established here. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124,

1138 (9th Cir. 2001) (citing *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998)).

The standard for intentional discrimination is deliberate indifference, "which requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall*, 260 F.3d at 1139. The first prong is satisfied when the plaintiff alerts the defendant to a specific, reasonable and necessary accommodation that the entity has failed to provide. *Id.* at 1139–40.

The second prong is satisfied by showing that the entity deliberately failed to fulfill its duty to act in response to a request for accommodation. *Id*. The entity's duty is to undertake a fact-specific investigation to gather from the disabled individual and qualified experts, sufficient information to determine what constitutes a reasonable accommodation, giving primary consideration to the requests of the disabled individual. *Id*. This prong is not satisfied if the failure to fulfill this duty to accommodate is a result of mere negligence, such as "bureaucratic slippage" or where the entity simply "overlooked" a duty to act. *Id.*

Adom failed to establish the required mindset. Rather the evidence shows that CDCR based its accommodation decisions on medical assessments and investigative reviews, and provided the accommodations found to be medically necessary. (ER-35–38, 119, 133–36, 139, 231.) He received medical attention, tests, medication, additional boxers and towels, and was authorized to access the

47

shower and obtain clean clothing and linens each time an incident occurred. (ER-35–38, 110, 131, 196.)

None of the medical and custody personnel Adom targets in his opening brief exhibited deliberate indifference. Dr. Montegrande was not deliberately indifferent because, as explained *supra*, she did not intentionally disregard any substantially serious risk concerning Adom's incontinence. (ER-124, *see also* ER-30, 32, 44–45, 122.)

Associate Warden Mojica was not deliberately indifferent because, as a custody staff member, he reasonably deferred to medical staff concerning what accommodation was appropriate. (ER-134, 136.) Such deference to medical professionals responsible for monitoring and addressing the issue does not amount to deliberate indifference. *See Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Johnson v. Doughty*, 433 F.3d 1001, 1011-122 (7th Cir. 2006) (no liability where official confirmed that medical staff was monitoring and addressing the issue); *Spruill*, 372 F.3d at 236 ("If a prisoner is under the care of medical experts … a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.").

Warden Atchley also was not deliberately indifferent. Adom did not establish that his letter to the Warden's Office was factually sufficient to provide notice that a federally protected right was substantially likely to be violated. And regardless,

Atchley delegated inmate letters to his staff for investigation and response, and nothing in the record shows that he knew this established process to be deficient or otherwise knew that Adom's incontinence episodes had not been properly addressed. (ER-67–68.) *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (holding that supervisors can be found deliberately indifferent based only on their own culpable actions because they are not vicariously liable for the actions of their subordinates).

Dr. Ladd and Dr. Lotersztain's reasoned medical decisions regarding what treatment was appropriate do not amount to deliberate indifference. (ER-35–37, 130–31, 164–67.) *Toguchi*, 391 F.3d at 1058. And Adom fails to show how the speed with which the accommodation was provided after Dr. Lotersztain's December 29 authorization could amount to *intentional* discrimination or exclusion *based on disability*. *McGary,* 386 F.3d at 1265 (legal standard).

Similarly, CEO Sawyer's administrative grievance reviews reasonably deferred to the assessments of medical staff and noted that a primary-care appointment had already been scheduled for Adom to address his accommodation needs with his doctor (SER-19–21, 33–35, 48–49), which does not establish deliberate indifference. *See Giles*, 914 F.3d at 1049; *Spruill*, 372 F.3d at 236.

And by the time the grievances reached the Headquarters' level review, Adom was already receiving the incontinence accommodation at issue. (SER-13–14, 26–27, 29, 31, 40–41.)

Adom's cursory references to his communications with custody staff (*see, e.g.* AOB 24) also do not establish deliberate indifference.

Thus, Adom failed to establish the deliberate indifference necessary for a damages claim under the ADA.

### D. Adom's Claim for Injunctive Relief Fails.

#### 1. Legal standard.

A claim for injunctive relief requires a threshold showing that a case or controversy exists, both at the commencement of the litigation (standing) and throughout its existence (mootness). *Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008) ("The jurisdictional question of standing precedes, and does not require, analysis of the merits."). A plaintiff must "demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up).

In general, injunctive relief is "to be used sparingly, and only in a clear and plain case." *Rizzo v. Goode,* 423 U.S. 362, 378 (1976) (cleaned up). Where, as here, a government agency is involved, courts must observe the requirement that

the government be granted the "widest latitude in the dispatch of its own internal affairs." *Id.* at 378–79. Accordingly, injunctive relief is appropriate only when "irreparable injury" is threatened. *Gomez v. Vernon*, 255 F.3d 1118, 1128 (9th Cir. 2001). "This well-established standard for injunctive relief must also be viewed in conjunction with the requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626." *Id.*

The Prisoner Litigation Reform Act limits courts' power to grant prospective relief by mandating that any relief granted be narrowly drawn, employ the least intrusive means necessary, and extend no further than necessary to correct the violation of the federal right at issue. 18 U.S.C. §§ 3626(a)(1), 3626(g)(7) (defining "prospective relief" as "all relief other than compensatory monetary damages").

### 2.    Adom is not entitled to injunctive relief.

Adom's claim for injunctive relief fails for lack of standing. "It is the plaintiff's burden, in a lawsuit brought to force compliance, to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue and that the threatened injury is certainly impending." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000); *Davis*, 554 U.S. at 734 (requiring standing for each claim). Adom cannot meet this burden because CDCR's administrative process

resolved the issue well before this litigation began: he started receiving the incontinence supplies at issue nearly a year before he brought suit and continued receiving them during the litigation. (ER-54–55, 187; SER 61.) Thus, there is no live controversy to support Adom's claim for injunctive relief. *Wiggins v. Rushen*, 760 F.2d 1009, 1010-11 (9th Cir. 1985).

Adom already has received all injunctive relief that reasonably could be provided through this litigation. (AOB 37–38.) Adom incorrectly asserts that more relief is available because his existing accommodation is not classified as "permanent." (*Id.*) But that presupposes that Adom's incontinence is also "permanent," i.e., that the condition will never improve — a contention that is not backed up by any competent evidence. In any case, the permanent designation would not create an immutable future entitlement to incontinence supplies; to be sure, even permanent designations are subject to revision or removal at any time, based on the patient's status and medical necessity. (*Cf.* AOB 38 *with* Cal. Code Regs. tit. 15 § 3999.394(g).)

Moreover, an order directing permanent relief, in the strict sense, is not reasonably available through this litigation. When a movant seeks an order mandating an affirmative action, the relief sought goes well beyond simply maintaining the status quo and is "particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Mandatory injunctions are inappropriate in

doubtful cases and should not issue "unless the facts and law clearly favor the moving party." *Id*. (cleaned up). *Toussaint v. McCarthy*, 801 F.2d 1080, 1086 (9th Cir. 1986) (requiring courts "must be consistent with the policy of minimum intrusion into the affairs of state prison administration.").

An injunction mandating permanent treatment with incontinence supplies also would not pass muster under the PLRA because it is neither narrowly drawn nor the least intrusive solution available, and it would be patently inappropriate here, where there is no ongoing deprivation of a federal right. 18 U.S.C. §§ 3626(a)(1), 3626(g)(7)

Adom's voluntary cessation and policy arguments misconceive the law. (AOB 37–38.) Where, as here, a plaintiff lacks standing when the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle him to a federal judicial forum. *Friends of the Earth, Inc.*, 528 U.S. at 191. CDCR did not authorize Adom to receive incontinence supplies in response to this lawsuit. (ER-46.) Rather, CDCR's administrative process to resolve issues worked: Adom received the relief he requested after submitting grievances and accommodation requests that ultimately led to a medical diagnosis for incontinence supplies nearly a year before he brought suit. (*Id.*) For these reasons, Adom's speculation that CDCR might engage in gamesmanship by changing its policy or revoking his authorization for the supplies after this litigation ends is not supported

by any evidence. *See Rosebrock v. Mathis*, 745 F.3d 963, 973 (9th Cir. 2014). And Adom fails to show why any such deprivation would evade review.

Since Adom did not identify any actual or imminent injury that would likely be redressed by a grant of injunctive relief, his claim for injunctive relief fails.

## CONCLUSION

For the reasons stated above, this Court should affirm the judgment.

Dated: February 28, 2025                    Respectfully submitted,


            *s/ Jaime M. Ganson*

Rob Bonta
  *Attorney General of California*
Monica N. Anderson
  *Senior Assistant Attorney General*
Neah Huynh
  *Supervising Deputy Attorney General*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** _____ 24-4756 _____

The undersigned attorney or self-represented party states the following:

[ X ]  I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** ___ */s/ Jaime M. Ganson* _____ **Date** ____ 02/28/2025 _____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/18*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____24-4756_____

I am the attorney or self-represented party.

**This brief contains** _____11,780_____ **words,** including ____0_____

words manually counted in any visual images, and excluding the items exempted by

FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** ___*/s/ Jaime M. Ganson*___ **Date** ____2/28/2025____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

No. 24-4756

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

BILAL ADOM,

*Plaintiff-Appellant,*

V.

CALIFORNIA DEPARTMENT OF CORRECTIONSAND
REHABILITATION, ET AL.,

*Defendants-Appellees.*

———————————

**On Appeal from the United States District Court**
**for the Northern District of California**
No. 4:22-cv-07150-JSW
The Honorable Jeffrey S. White

———————————

**ADDENDUM**

———————————

Rob Bonta
  *Attorney General of California*
Monica N. Anderson
  *Senior Assistant Attorney General*
Neah Huynh
  *Supervising Deputy Attorney General*
Jaime Ganson
  *Deputy Attorney General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Jaime. Ganson@doj.ca.gov
  *Attorneys for Defendants-Appellees*
  *CDCR, Atchley, Lotersztain, Mojica,*
  *Montegrande, and Sawyer*

## DEFENDANTS-APPELLEES' ADDENDUM
## TABLE OF CONTENTS

California Code of Regulations title 15,

      § 3999.98  …..………..……………………………………...ADD-1–14

      § 3999.390  …………..……………………………………...ADD-15–16

      § 3999.393  …………..……………………………………...ADD-17–18

      § 3999.394 ..…………..…………..…………………… ADD-19–20

Barclays California Code of Regulations
Title 15. Crime Prevention and Corrections
Division 3. Adult Institutions, Programs and Parole
Chapter 2. Rules and Regulations of Health Care Services
Article 1. Health Care Definitions

15 CCR § 3999.98

§ 3999.98. Definitions.

Currentness

For the purposes of this chapter, the following definitions apply:

Accommodation means reasonably necessary and appropriate modification or adjustment, not imposing a disproportionate or undue burden, to ensure a patient with a disability has equal access to programs, services, and activities.

Administer means the direct application of a drug or device to the body of a patient by injection, inhalation, ingestion, or other means.

Administrative Supervision means staff in supervisory positions who are responsible for administrative tasks for assigned employees including, but not limited to, completing probationary and annual evaluations, assessing proficiency in job duties, authorizing time off, and timekeeping activities.

Advance Directive for Health Care means a written instrument which allows the patient to do either or both of the following: 1) state instructions for future health care decisions; 2) appoint an agent with power of attorney for health care.

Advanced Practice Provider means Nurse Practitioner (NP) and Physician Assistant (PA) staff who are authorized to provide health care and dispense controlled substances by the state in which they practice.

After-hours means times when the pharmacy is closed or unavailable including holidays, weekends, and after regular business hours.

Agent means an individual designated in a power of attorney for health care to make a health care decision for the principal, regardless of whether the person is known as an agent, legally recognized decision-maker, or attorney-in-fact, or by some other term. Agent includes a successor or alternate agent.

Allied Health Services means health care professions including clinical laboratory personnel, physical therapy, occupational therapy, dietetic services, medical record personnel, radiologic services, speech-language pathology and audiology, and respiratory therapy that promote interdisciplinary communication and collaboration and the efficient use of resources by various health care providers to improve health care.

Basic Life Support means emergency care performed to sustain life that includes cardiopulmonary resuscitation, automated external defibrillation, control of bleeding, treatment of shock, and stabilization of injuries and wounds.

**ADD-001**

Breach means the unauthorized acquisition, access, use, or disclosure of Protected Health Information (PHI) or Personally Identifiable Information (PII) that compromises the security, confidentiality, or integrity of personal information maintained by the Department.

Business Associate means an individual or corporate "person" who performs on behalf of the Department or on behalf of another business associate of the Department any function or activity involving the use or disclosure of PHI for which the Department is responsible, and is not a member of the Department's workforce.

Business Day means Monday through Friday, except for holidays.

California Department of Corrections and Rehabilitation Heart Healthy Diet means a diet plan restricted in sodium and fat while supplying adequate calories, fiber and all essential nutrients, provided by the Department and approved by a Registered Dietitian.

California Department of Corrections and Rehabilitation Standardized Master Menu means a four-week menu cycle based on the California Department of Corrections and Rehabilitation (CDCR) Heart Healthy Diet that is planned by the CDCR Food Administrator and approved by a Registered Dietitian.

Capacity or Lack of Capacity is to be determined by evaluating the person's: (a) ability to communicate a choice; (b) ability to understand relevant information; (c) ability to appreciate the nature of the situation and its likely consequences; and (d) ability to manipulate information rationally.

Care Coordination means the deliberate organization of patient care activities between two or more participants involved in a patient's care to facilitate the appropriate delivery of health care services and minimize the danger of care fragmentation.

Care Management means a collaborative process of patient assessment, evaluation, advocacy, care planning, facilitation, and coordination. The extent of care management services varies according to the complexity of the patient.

Care Team means an interdisciplinary group of health care professionals who combine their expertise and resources to provide care for a panel of patients.

Case Conference means an action recommended by the Medical Peer Review Committee (MPRC) requesting that the originating institution's Chief Medical Executive (CME) meet with all medical staff to discuss a specific concern(s) resulting from a peer review case.

Chronic Care means the ongoing care for a current health problem that impacts or has the potential to impact a patient's functioning and long-term prognosis and has lasted, or is expected to last, for more than six months.

Clinical Pathway means a complex, interdisciplinary management tool and series of interventions based on evidence-based practice for the mutual decision-making and organization of care processes for a well-defined group of patients with a predictable clinical course.

Clinical Performance Appraisal means an evaluation conducted at the request of the MPRC or the Health Care Executive Committee (HCEC).

Clinical Practice means the skill, knowledge, and competency of a licensed medical provider reflected in the licensed medical provider's quality of care.

Clinical Supervision means staff in supervisory positions who are responsible for the supervision of clinical tasks. This includes the institution Physician Managers which are comprised of the Chief Physician and Surgeon, Chief Medical Executive, Chief

Psychiatrist, and Supervising Psychiatrist, and Institution Nursing Managers which include Chief Nurse Executive, Supervising Registered Nurse, Unit Supervisor, and Nurse Consultant III.

Coccidioidomycosis 2 Area means institutions that pose the highest risk of coccidioidomycosis (cocci) exposure.

Coccidioidomycosis 2 Restriction means a medical restriction based on a combination of a history of cocci disease, medical high risk, negative cocci skin test results (if tested), race (e.g., African-American or Filipino), and medical conditions (e.g., diabetes mellitus); patients with a coccidioidomycosis 2 restriction are designated as such in the cocci risk registry.

Coccidioidomycosis Skin Test means the skin test used to determine hypersensitivity reaction to the spherulin antigen (a component of the fungus that causes cocci).

Competency means the documented demonstration of an individual having the requisite or adequate abilities or qualities capable to perform up to a defined expectation.

Complex Care Management means management of patients with complex biopsychosocial needs.

Concurrent Review means a review to evaluate the ongoing need for acute, sub-acute, or non-acute levels of care including review of admissions, continued stays, and discharge planning activities.

Contraband Surveillance Watch means the isolation and restriction of movement for observation of incarcerated persons who are suspected or known to have ingested or inserted contraband into a body cavity.

Controlled Use of Force means the force used in an institution setting when an incarcerated person's presence or conduct poses a threat to safety or security and the incarcerated person is located in an area that can be controlled or isolated. These situations do not normally involve the immediate threat to loss of life or immediate threat to institution security.

Correctional Treatment Center means a health care facility operated by the Department that provides inpatient health care services to patients who do not require a general acute care level of essential services and are in need of professionally supervised health care that cannot be provided on an outpatient basis.

Covered Entity means health plans, health care clearinghouses, and health care providers who transmit any health information in electronic form in connection with a transaction that is subject to federal Health Insurance Portability and Accountability Act (HIPAA) of 1996 requirements, as those terms are defined and used in the HIPAA regulations, 45 Code of Federal Regulations sections 160 and 164.

Credentialing means the system of screening and evaluating qualifications and other credentials including, but not limited to, licensure, certification, required education, relevant training and experience, and current competence and health status.

Data Use Agreement means a contractual agreement that establishes who is permitted to use and receive a Limited Data Set, and the permitted uses and disclosures of such information by the recipient.

Death means an individual has sustained either: 1) an irreversible cessation of circulatory and respiratory functions, or; 2) irreversible cessation of all functions of the entire brain, including the brain stem.

Death Review means a type of review conducted by Nurse Consultant Program Review staff which assesses the quality and appropriateness of nursing care, nursing practice issues, best practices, and factors that may have significantly impacted the quality of patient care, thereby contributing to the death of a patient.

**ADD-003**

Decision Support Tools means materials used by clinical staff to inform and support evidence-based practices based on clinical knowledge and patient specific assessments.

Determination of Death means the process of establishing death has occurred through assessment of objective data in accordance with standards of care, including obtaining an independent confirmation by another physician when death occurs due to the cessation of brain function.

Diet Instruction means specific dietary recommendations including careful food choices based on the CDCR Heart Healthy Diet, provided by a Registered Dietitian or other health care staff within the scope of their licensure.

Directly Observed Therapy means dose-by-dose administration of medications by appropriately licensed health care staff including, but not limited to, Registered Nurse (RN), Licensed Vocational Nurse (LVN), or Psychiatric Technician (PT) using the highest level of observation of ingestion of medication administered to the patient.

Disclosure means the release, transfer, provision of, access to, or divulging in any other manner of information outside the entity holding the information.

Dispense means the furnishing of drugs or devices following a prescription from a licensed prescriber or directly given to a patient by a licensed prescriber.

Do Not Resuscitate means a written order which directs that resuscitation efforts are not to be initiated in the event of cardiac or respiratory arrest.

Ducat means a CDCR 129, Incarcerated Person Pass (Rev. 07/24) There are two types of ducats, "Priority" and "Non-Priority." Priority ducats are stamped with the word "Priority" and are used for scheduled health care appointments. Non-Priority ducats are used for unscheduled appointments and unescorted movement from one location to another.

Durable Medical Equipment means equipment prescribed by a licensed provider to meet medical equipment needs of the patient that can withstand repeated use; is used to serve a medical purpose; is not normally useful to an individual in the absence of an illness, injury, functional impairment, or congenital anomaly; and is appropriate for use in or out of the institutional housing.

Emergency Response means the organizing, coordinating, and directing of available resources in order to respond to an event and bring the emergency under control.

Endorsed Institution means a CDCR institution where a patient is assigned and housed.

Expected Death means a medically anticipated death which is related to the natural course of a patient's illness or underlying condition.

Final Proposed Action means the MPRC recommended final action to modify privileges in any manner which includes a chronology of the major events in the peer review process and supporting documentation that is submitted to the HCEC.

First Aid means emergency care administered to an injured or sick patient before health care staff is available.

First Responder means the first staff member certified in Basic Life Support (BLS) on the scene of a medical emergency.

Focused Professional Practice Evaluation means an evaluation process comprised of chart reviews and licensed medical provider's input to obtain a generalized or focused overview of a licensed medical provider's clinical performance.

§ 3999.98. Definitions., 15 CA ADC § 3999.98

Foreign Body means an object within the body that has been introduced from the outside, including but not limited to contraband items.

Governing Body means a person, persons, board of trustees, directors, or other body in whom the authority and responsibility is vested for the conduct and oversight of a licensed inpatient facility.

Handoff means a transfer of information from one health care staff or care team to another for the purpose of ensuring the continuity and safety of the patient's care.

Health Care First Responder means the first health care staff member certified in BLS to arrive at the scene of a medical emergency.

Health Care Grievance Communications means patient specific communication provided through health care grievance interviews, institution level responses, rejection notices, or withdrawal notices.

Health Care Incident means an unusual or unexpected occurrence in the clinical management of a patient or patients, such as an error, sentinel event, near miss, accident, or medication event that has or may have adverse health consequences for patients or staff, and requires submission of a written description of the event to the Statewide Health Care Incident Review Committee.

Health Care Operations means any health care activities of the Department or a covered entity to the extent that the activities are related to conducting quality assessment and improvement activities; population-based activities; reviewing the competence or qualifications of health care professionals; conducting or arranging for medical review, legal services, and auditing functions; business planning and development; and business management and general administrative activities.

Health Care Provider means a Medical Doctor, Doctor of Osteopathy, Doctor of Podiatric Medicine, Clinical Psychologist, Dentist, Clinical Social Worker, NP, or PA.

Health Care Services means medical, mental health, dental, pharmaceutical, diagnostic and ancillary services to identify, diagnose, evaluate, and treat a medical, mental health, or dental condition.

Health Care Services Dashboard means a monthly report that consolidates strategic performance information across key health care areas and provides data at both statewide and institution levels and shows trends in performance over time.

Health Care Staff means those persons licensed by the state to provide health care services, who are employed by the Department or are working under direct or indirect contract with the Department to provide health care services.

Health Care Treatment Areas means any location where patient health care services are provided including, but not limited to, medical clinics, dental clinics, designated triage and treatment areas, or standby emergency rooms where urgent/emergent treatment may be required and the location is not licensed by the California Department of Public Health under California Code of Regulations, Title 22, Division 5, or by the California State Board of Pharmacy pursuant to Business and Professions Code section 4187.

Health Maintenance Services means a systematic program or procedure planned to prevent illness, maintain maximum function, and promote health.

Health Record(s) means paper-based records, electronic records, and other media that document the patient's health care and provide a chronological account of a patient's examinations and treatments. Health records shall be maintained in a manner that supports continuity of care.

**ADD-005**

Heat Alert Medications means medications that can pose a serious risk to a patient's health during times of extreme heat by impairing the body's ability to regulate temperature.

High Alert Medications means a drug that bears a heightened risk of causing significant patient harm when used in error. Mistakes may or may not be more common with these drugs, but the consequences of an error are more devastating to patients.

Hoarding means stockpiling of medications by the patient.

Hospice means services that are designed to provide palliative services to patients needing end-of-life care.

Hygiene Supplies means supplies available without a prescription for personal care. Hygiene supplies are generally used for non-medical purposes and are not medical supplies.

Individual Hunger Strike Participant means an incarcerated person who is identified by Department custody staff as a participant in an individual hunger strike.

Informal Hearing means a hearing offered to licensed medical providers who are subject to a modification of privileges in order to provide a licensed medical provider with an opportunity to respond to and provide evidence to refute the allegations that provide the basis for the modification of clinical privileges.

Informed Consent means a patient who has the capacity to make informed decisions is made aware of risks, benefits, and alternatives to proposed treatment for a disease or condition from which the patient suffers, and the patient is able to agree and clearly agrees to the recommended treatment without duress or coercion.

Informed Refusal occurs when a patient who has documented capacity to give informed consent and elects to knowingly refuse to consent to a given medication or recommended course of treatment.

Interested Person means any blood relative of the first, second, or third degree, or in a capital case, the patient's designated next-friend.

Interferon-Gamma Release Assays Test means the standard method used by the Department for the detection of recent or past Tuberculosis (TB) infection.

Interventions means actions that focus on the execution of the specific care management activities that are necessary for accomplishing the goals set forth in the patient's treatment plan, linking the patient to the services needed to optimize health.

Judicial Review Committee means a three-member panel composed of independent and impartial physicians who shall, by majority vote, determine the final outcome of a privileging action taken against a licensed medical provider when appealed by the licensed medical provider.

Keep-on-Person means medications that the prescriber believes can be safely self-administered by the patient.

Layover means a temporary delay or stop at an intermediate location during the transportation phase of a transfer of care.

Legally Recognized Decision-Maker means an agent designated in an advance directive, orally designated surrogate, spouse, registered domestic partner, parent of a minor, closest available relative, court-appointed conservator or guardian, or person whom the patient's Primary Care Provider believes best knows what is in the patient's best interest and shall make decisions in accordance with the patient's expressed wishes and values to the extent known.

§ 3999.98. Definitions., 15 CA ADC § 3999.98

Licensed Medical Provider means CME, Deputy Medical Executive, Chief Physician and Surgeon, Physician and Surgeon, NP, PA, Nurse Anesthetist, Podiatrist, and Specialty Consultant Practitioners.

Licensed Units means any health care treatment area which has beds that have been licensed by the California Department of Public Health under California Code of Regulations, Title 22, Division 5 or a health care treatment area that has been licensed by the California State Board of Pharmacy pursuant to Business and Professions Code Chapter 9, Division 2, Article 13.5, section 4187.

Limited Data Set means PHI that excludes the following direct identifiers of the patient or of relatives, employers, or household members of the patient: names; postal address information other than town or city, state and zip code; telephone numbers; fax numbers; electronic mail addresses; social security numbers; health record numbers; health plan beneficiary numbers (such as Medi-Cal numbers); account numbers; certificate/license numbers; vehicle identifiers and serial numbers, including license plate numbers.

Lockdown means an emergency safety procedure where a portion of the institution is affected by suspension of required programs or services, and patients are not released except as determined by the institution administration on an individual, case-by-case basis.

Locked Unit means a restricted or segregated program housing unit including, but not limited to, Protective Housing Units, Psychiatric Services Units, Security Housing Units, and Administrative Segregation Units.

Mass Organized Hunger Strike means an organized hunger strike including multiple incarcerated persons who have a common goal or set of demands.

Mass Organized Hunger Strike Participant means an incarcerated person identified by Department custody staff as participating in a mass organized hunger strike.

Medical Assistant means the same thing as in Business & Professions Code section 2069(b)(1).

Medical Classification means the process of mapping patient attributes to Medical Classification Factors.

Medical Classification System means the system that provides the matching between patients and institutions based on patient attributes and institution attributes.

Medical Emergency means any medical, mental health, or dental condition, as determined by health care staff, for which immediate evaluation and treatment are necessary to prevent death, severe or permanent disability, or to alleviate disabling pain. A medical emergency exists when there is a sudden marked change in an individual's medical condition so that action is immediately necessary for the preservation of life, alleviation of severe pain, or the prevention of serious bodily harm to the patient or others.

Medical High Risk means patients who have a medical risk designated as high per the automated clinical classification system.

Medical/Psychiatric and Return means the process used when a patient requires medically necessary health care services which are only accessible at or via a CDCR institution other than the patient's endorsed institution. Medical/psychiatric and return requires an overnight stay at the treating institution prior to the return to the endorsed institution.

Medical Supplies means supplies prescribed by a licensed provider to meet medical supply needs of the patient that meet the following criteria: cannot withstand repeated use; are usually disposable in nature; are used to serve a medical purpose; are not

ADD-007

useful to an individual in the absence of an illness, injury, functional impairment, or congenital anomaly; and are intended for use by the patient in an outpatient setting.

Medically Necessary means health care services that are determined by the attending or primary medical, mental health, or dental care provider(s) to be needed to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data or clinical evidence as being an effective health care service for the purpose intended or in the absence of available health outcome data is judged to be necessary and is supported by diagnostic information or specialty consultation.

Medication Adherence means the extent to which patients take medications as prescribed.

Medication Administration Area means all areas that store medications located outside of the correctional pharmacy irrespective of license (e.g., medication cart, medication room, nursing stations, or Triage and Treatment Area).

Medication Error means any preventable event that may cause or lead to inappropriate medication use or patient harm as a result of professional practice, health care products, procedures, and systems.

Medication Refusal means the patient declines the prescribed medication (Directly Observed Therapy [DOT], Nurse Administered, or Keep-on-Person) or declines to comply with medication procedures either at the cell front or during medication line.

Medication Renewal means a new medication order which is required for dispensing of any medication for which the current order is expired or expiring.

Mental Health Evaluation means a psychological evaluation performed by a mental health clinician that includes a brief narrative of the presenting problem, historical information of relevance, a mental status examination and assessment of level of functioning, determination of need for mental health treatment and recommended level of care, and a referral to a psychiatrist if there is a possible need for psychotropic medication or other psychiatric intervention.

Modified Program means the suspension or restriction of patient program activities or movement that impacts less than all programs or less than all patients. A modified program may either occur independently in response to an incident or unusual occurrence or may occur as a facility transitions from a lockdown to regular programming.

Near Miss means an event or situation that could have resulted in a health care incident but did not, either by chance or through timely intervention.

Non-business Days means Saturdays, Sundays and State holidays.

Normal Business Hours means a minimum of eight hours per business day. These hours may vary by institution, but are generally between the hours of 0700 and 1800.

Nourishments means approved food items, in addition to the standard meal, ordered for patients with certain medical or dental conditions.

Nurse Administered means dose-by-dose administration of medications by appropriately licensed health care staff that do not require DOT procedures, only reasonably observed ingestion of medication.

Nurse Practitioner means the same thing as in 16 California Code of Regulations section 1480(o).

Nurse Protocol means a specific written procedure that prescribes nursing actions in a given situation.

Nursing means the protection, promotion, and optimization of health and abilities, prevention of illness, alleviation of suffering through the diagnosis and treatment of human response, and advocacy in the care of individuals, communities, and populations.

Open Access means a scheduling strategy that involves "doing today's work today" and seeing patients as soon as possible after they request care, and on the same day if appropriate. Open access slots are appointment times or blocks that are left open and unscheduled until one to two days prior to that date, allowing the care team to accommodate walk-in patients, patients with urgent health needs, and patients with routine health needs that would benefit from expedited services.

Opt-Out Screening Method means the patient is informed of the routine laboratory tests that will be performed as part of the RC Initial Health Screening and Triage unless the patient specifically declines a test.

Order Sets means printed or electronic orders available for commonly performed interventions. These are different from standing orders in that they are not conditional. The provider determines whether the order sets will be used, and if variations to the order sets are required, the provider notes the variation in the patient's chart.

Outcome Data or Clinical Evidence means the professionally accepted results of studies and analyses, using evidence-based methodologies and expert clinical judgment, regarding the effectiveness of various health care services, how those services relate to patient morbidity and mortality, and overall efficiency and effectiveness of care.

Outpatient Housing Unit means a designated housing area within institutions designed to provide supportive services, including low-intensity nursing care, for patients who may require limited assistance with activities of daily living or short-term observations.

Outpatient Therapeutic Diet means a medically necessary therapeutic diet ordered by a PCP or dentist.

Over-the-Counter Products means commonly utilized health care products which are available to the general public without a prescription.

Palliative Care means services that support a patient in managing his or her health care needs associated with a serious illness. Services are designed to provide comfort, relief from pain, support the patient, and to maintain or improve functioning and quality of life. Palliative care services can be provided at any stage of illness and at all levels of care within the Department.

Parole means release of an incarcerated person from imprisonment to the community by a releasing authority prior to the expiration of the incarcerated person's prison term.

Patient means an incarcerated person who is seeking or receiving health care services or who is assigned to a care team.

Patient Panel means a clearly defined group of patients that are assigned to a particular care team. Every care team has one panel of patients, and every patient is assigned to a care team.

Patient Registries means lists of patients with specific conditions or eligible for certain preventive services that include clinical information helpful to the management of these patients.

Patient Safety Alert means a bulletin issued to all institutions informing them of a patient safety issue with statewide implications, which may include actions to mitigate harm to patients.

Patient-initiated means the patient sought health care services through Department staff or reported to health care staff for consultation and/or treatment without having first been contacted or scheduled by health care staff.

ADD-009

Payment means the activities undertaken by the Department to obtain or provide reimbursement for the provision of health care.

Peer Review Formal Investigation means an investigation into the clinical performance or conduct of a licensed medical provider pursuant to allegations that the licensed medical provider's clinical performance or conduct falls below the applicable standard of care. A Formal Investigation is an investigation as that term is used in Business and Professions Code sections 805(c) and 805.01(b).

Performance Improvement Plan means a plan that identifies priority areas for improvement, as well as performance objectives and strategies used to achieve objectives.

Permanent means expected to last longer than six months.

Personal Representative means a person who has authority, under applicable state law, to act on behalf of a patient in making health care decisions related to the patient.

Personally Identifiable Information means any information that is maintained by the Department that identifies or describes an individual, including, but not limited to, his or her name; social security number; physical description; home address; home telephone number; education; financial matters; and medical or employment history. It includes statements made by, or attributed to, the individual. PII may include information that is not necessarily PHI and may pertain to the Department employees, members of the public, or other individuals who may or may not be patients.

Physician Assistant means the same thing as in Business & Professions Code section 3501(d).

Physician Orders for Life-Sustaining Treatment means a physician order that documents a patient's "preferred intensity of care" concerning life-sustaining treatment and end of life care, including resuscitation status, and which translates those expressed preferences into a physician's order.

Population means a group of patients sharing a common health characteristic, such as age, gender, race or ethnicity, risk level, or chronic condition.

Population Management means systematic assessment, monitoring, and management of the health care needs for identified groups of patients.

Potential Quality Issue means a health care incident, regardless of severity, which occurs during the course of treatment by a Healthcare Provider Network facility or provider and requires submission of a written Potential Quality Issue referral.

Prescription means oral, written, or electronic transmission that is given to the person for whom ordered and is issued by a physician, dentist, Optometrist, Podiatrist, naturopathic doctor, NP, PA or other person lawfully authorized to prescribe pursuant to their license in the State of California.

Primary Care Provider means a physician, NP, or PA designated to have primary responsibility for the patient's health care or, in the absence of a designation or if the designated physician is not reasonably available or declines to act as primary physician, a physician who undertakes the responsibility.

Primary Care Team means an interdisciplinary team that organizes and coordinates services, resources, and programs to ensure consistent delivery of appropriate, timely, and patient-centered, evidence-based care to a designated patient panel.

ADD-010

Privilege Modification means a temporary or permanent change in a licensed medical provider's privileges including a denial, suspension, restriction, reduction, or revocation of any or all of a licensed medical provider's privileges.

Privileging means the process by which a licensed medical provider is permitted by law and the facility to provide specified medical or other patient care services. Clinical privileges must be facility-specific, provider-specific, and within available resources.

Proctoring means the assignment of a licensed medical provider to observe the practice of another licensed medical provider performing specified activities and to provide required reports on those observations.

Procurement means the purchase of pharmaceuticals by the pharmacy.

Professional Misconduct means conduct and behavior that disrupts, or is likely to disrupt, clinical operations and may impact patient or staff safety, or is "unprofessional" pursuant to California Business and Professions Code sections 2220 et seq.

Pronouncement of Death means the formal process of recording the death in the health record and communicating the death to the patient's next of kin.

Prospective Review means a review conducted prior to services being rendered to determine whether the patient's illness necessitates the requested level of care or services or could be provided at a lower level of care.

Protected Health Information means information created or received by the Department which identifies or can be used to identify an individual as it relates to past, present, or future health conditions; health care services provided to the individual; or health care related payments. This applies to information that is transmitted or maintained in verbal, paper, or electronic form.

Protocols means evidenced based practice procedures that represent the framework for managing a specific disorder or clinical situation by outlining the desired outcome, the process steps and tasks, the skills and competencies required, scope of practice, and action taken.

Provider Network means a group of licensed health care practitioners and hospitals working under a contract with the Department who provide health care services to CDCR patients.

Psychotherapy Notes means notes recorded in any medium by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session, and that are separated from the rest of the patient's medical record.

Reading Glasses means ready-made, single-vision glasses that are designed to lessen the focusing burden during up close activities, such as reading.

Reception Center Focused Health Assessment means a face-to-face focused physical assessment performed by a PCP and documented in the health record during the RC Initial Screening.

Reception Center Initial Health Screening and Triage means a face-to-face assessment conducted by licensed nursing staff, which includes a review of the patient's available health records, an interview, a brief health history, and a focused objective physical assessment based on the records review and patient interview.

Retrospective Review means a review to evaluate the medical necessity and appropriateness of treatment after it has been rendered, as well as to compare billed services with the actual treatment authorized.

ADD-011

Risk Stratification means the continuous use of data and predictive modeling to differentiate patients into risk levels.

Root Cause Analysis means a structured and standardized process by which a multidisciplinary team analyzes a health care incident, near miss, or sentinel event, determines the fundamental reasons why the event occurred, and designs and implements a plan of action to prevent similar events from occurring in the future.

Rounds means the act of seeing a patient in an inpatient setting to observe and communicate with the patient, evaluate the patient's current condition, their response to treatment, determine if their care needs are being met by the current plan of care and to assess their environment of care. Rounds may be conducted by individual disciplines, or they may be multidisciplinary.

Safety Assessment means an evaluation to determine whether failure to take immediate action regarding the clinical performance of a licensed medical provider may result in imminent danger to the health of patient(s) or staff.

Sentinel Event means a patient safety event, including adverse events as defined in California Health and Safety Code section 1279.1, not primarily related to the natural course of the patient's illness or underlying condition that results in death, permanent harm, or a temporary impairment that affects the patient and limits their ability to function normally for a significant amount of time.

Severe Pain means a degree of discomfort that significantly disables the patient from reasonable independent function.

Significant Illness and Disability means any medical, mental health, or dental condition that causes or may cause, if left untreated, a severe limitation of function or ability to perform the daily activities of life or that may cause premature death.

Skilled Nursing Facility means a health facility or a distinct part of a hospital which provides continuous skilled nursing care and supportive care to patients whose primary need is for skilled nursing care on an extended basis. It provides 24-hour inpatient care and at a minimum includes physician, skilled nursing, dietary, and pharmaceutical services as well as an activity program.

Specialized Health Care Housing means a distinct housing unit located within a facility or institution operated by the Department that provides health care services 24 hours a day to patients who are in need of professionally supervised health care. Specialized Health Care Housing units may, or may not be licensed or accredited. Specialized Health Care Housing units include the following levels of care: Outpatient Housing Unit, Correctional Treatment Center, Mental Health Crisis Bed, Psychiatric Inpatient Program, Skilled Nursing Facility, Hospice, Acute Care Facility, and Intermediate Care Facility.

Specific Authorization means the same thing as in Business & Professions Code section 2069(b)(2).

Standard of Care means the reasonable degree of skill, knowledge, care, and conduct ordinarily possessed and exercised by members of the discipline and profession under similar circumstances.

Substantial Evidence means relevant evidence that a reasonable person could accept as adequate to support a conclusion.

Supplement means medically necessary high caloric drinks ordered by a PCP or dentist.

Technical Supportive Services means the same thing as in Business & Professions Code section 2069(b)(4)(A).

Texture Modified Diet means a CDCR Heart Healthy Diet or therapeutic diet that has been modified to allow ease in chewing or swallowing.

Transfer means the transportation of a patient between two points, such as from one prison to another or from one law enforcement entity (a state prison or a county jail) to another.

ADD-012

Transport means movement of a patient from their endorsed institution for the purposes of accessing health care or other services that are not available at the endorsed institution.

Treating Institution means the institution where a patient is sent to receive medically necessary health care services that cannot be provided at the endorsed institution.

Treatment means the provision, coordination, or management of health care related services by one or more health care providers, including the coordination or management of health care by a health care provider with a third party; consultation between health care providers relating to a patient; or for the referral of a patient for health care from one health care provider to another.

Tuberculin Skin Test means a method of determining whether a person is infected with Mycobacterium TB.

Tuberculosis Disease means a disease caused by bacteria known as Mycobacterium TB. TB is a treatable infectious disease that usually affects the lungs and airway, but may also affect other parts of the body.

Unit, when referring to OTC products, means a single manufacturer-packaged quantity of a particular OTC product. Examples include a single tube of cream, single bottle of lotion, single bottle of the same medication, or single box of blister cards filled with the same medication.

Urgent, when referring to medication orders, means needed in less than three business days based on the clinical judgment of the prescriber.

Use, when referring to PHI and PII, means the sharing, employment, application, utilization, examination, or analysis of information that identifies, or reasonably can be used to identify, an individual within the Department.

Workforce means employees, volunteers, trainees, and other persons whose conduct, in the performance of work for the Department or a business associate, is under the direct control of the Department or a business associate, whether or not they are paid by the Department or the business associate.

X-Ray means a photographic or digital image of the internal composition of something, especially a part of the body, produced by X-Rays being passed through it and being absorbed to different degrees by different materials.

**Credits**

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code; and *Plata v. Newsom* (No. C01-1351 JST), U.S. District Court, Northern District of California.

HISTORY

1. Change without regulatory effect adopting chapter 2 (subchapters 2-4, sections 3999.98-3999.440) and article 1 (sections 3999.98-3999.99) and renumbering and amending former subsections 3350(b)-(b)(4) and 3354.2(a)(1)-(3) to new section 3999.98 filed 8-6-2018 pursuant to section 100, title 1, California Code of Regulations (Register 2018, No. 32).

2. Amendment of section heading, section and NOTE refiled 1-7-2019 as an emergency, with further amendments; operative 1-9-2019. (Register 2019, No. 2). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 4-9-2019 or emergency language will be repealed by operation of law on the following day. (Original emergency action filed 8-1-2018, amending 15 CCR section 3350, which was subsequently renumbered to 15 CCR 3999.98 on 8-6-2018.)

**ADD-013**

3. Change without regulatory effect relocating and amending former section 3364.1, subsections (a)(6)-(7) to add definitions of "Capacity or Lack of Capacity" and "Informed Refusal" to section 3999.98 and amending NOTE filed 4-15-2019 pursuant to section 100, title 1, California Code of Regulations (Register 2019, No. 16).

4. Certificate of Compliance as to 1-17-2019 order, including amendment changing the definition of "Necessary" to "Medically Necessary," transmitted to OAL 4-9-2019 and filed 5-20-2019; amendments operative 5-20-2019 pursuant to Government Code section 11343.4(b)(3) (Register 2019, No. 21).

5. Amendment filed 7-1-2019 as an emergency; operative 7-1-2019 (Register 2019, No. 27). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 12-9-2019 or emergency language will be repealed by operation of law on the following day.

6. Amendment refiled 12-5-2019 as an emergency; operative 12-10-2019 (Register 2019, No. 49). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 3-9-2020 or emergency language will be repealed by operation of law on the following day.

7. Amendment refiled 3-9-2020 as an emergency; operative 3-10-2020 (Register 2020, No. 11). A Certificate of Compliance must be transmitted to OAL by 6-8-2020 or emergency language will be repealed by operation of law on the following day.

8. Certificate of Compliance as to 3-9-2020 order, including amendment of section, transmitted to OAL 6-8-2020 and filed 7-20-2020; amendments operative 7-20-2020 pursuant to Government Code section 11343.4(b)(3) (Register 2020, No. 30).

9. New definitions of "Informed Consent" and "Interested Person" filed 3-1-2021; operative 3-1-2021 pursuant to Government Code section 11343.4(b)(3) (Register 2021, No. 10).

10. New definition of "Health Record(s)" filed 10-28-2021; operative 1-1-2022 (Register 2021, No. 44). Filing deadline specified in Government Code section 11349.3(a) extended 60 calendar days pursuant to Executive Order N-40-20 and an additional 60 calendar days pursuant to Executive Order N-71-20.

11. New definitions of "Administrative Supervision," "Clinical Supervision," "Death," "Determination of Death," "Medical Assistant," "Nurse Practitioner," "Pronouncement of Death," "Specific Authorization" and "Technical Supportive Services" filed 5-22-2023; operative 7-1-2023 (Register 2023, No. 21).

12. New definition of "Reading Glasses" filed 5-31-2023; operative 7-1-2023 (Register 2023, No. 22).

13. Removal of previous definition of "Nurse Practitioner" inadvertently retained in 5-22-2023 order filed 6-13-2023 (Register 2023, No. 24).

14. Editorial correction restoring inadvertently omitted definition of "California Department of Corrections and Rehabilitation Heart Healthy Diet" (Register 2023, No. 44).

15. Change without regulatory effect amending section filed 7-1-2024 pursuant to section 100, title 1, California Code of Regulations (Register 2024, No. 27).

This database is current through 2/14/25 Register 2025, No. 7.

Cal. Admin. Code tit. 15, § 3999.98, 15 CA ADC § 3999.98

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Barclays California Code of Regulations
Title 15. Crime Prevention and Corrections
Division 3. Adult Institutions, Programs and Parole
Chapter 2. Rules and Regulations of Health Care Services
Subchapter 3. Health Care Operations
Article 9. Durable Medical Equipment/Supplies and Accommodations

15 CCR § 3999.390

§ 3999.390. Durable Medical Equipment and Medical Supplies.

Currentness

(a) The Department shall provide Durable Medical Equipment (DME) and medical supplies to patients as medically necessary to ensure patients have equal access to prison services, programs, and activities.

(b) Patients shall not have the option to order DME from third party vendors.

(c) Timeframes for delivery of prescribed DME, including nonformulary requests, and medical supplies are as follows:

(1) Same day.

(2) Expedited: within five calendar days.

(3) High priority: within 14 calendar days.

(4) Routine: within 90 calendar days.

(5) For patients returning to institutions from hospitals, medically necessary DME shall be available upon arrival at the institution.

**Credits**

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code; Armstrong Remedial Plan. *Armstrong v. Newsom* (No. C94-2307 CW), U.S. District Court, Northern District of California; and *Plata v. Newsom* (No. C01-1351 JST), U.S. District Court, Northern District of California.

HISTORY

1. New section filed 7-1-2019 as an emergency; operative 7-1-2019 (Register 2019, No. 27). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 12-9-2019 or emergency language will be repealed by operation of law on the following day.

2. New section refiled 12-5-2019 as an emergency; operative 12-10-2019 (Register 2019, No. 49). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 3-9-2020 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 3-9-2020 as an emergency; operative 3-10-2020 (Register 2020, No. 11). A Certificate of Compliance must be transmitted to OAL by 6-8-2020 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 3-9-2020 order transmitted to OAL 6-8-2020 and filed 7-20-2020 (Register 2020, No. 30).

This database is current through 2/14/25 Register 2025, No. 7.

Cal. Admin. Code tit. 15, § 3999.390, 15 CA ADC § 3999.390

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-016**

Barclays California Code of Regulations
Title 15. Crime Prevention and Corrections
Division 3. Adult Institutions, Programs and Parole
Chapter 2. Rules and Regulations of Health Care Services
Subchapter 3. Health Care Operations
Article 9. Durable Medical Equipment/Supplies and Accommodations

15 CCR § 3999.393

§ 3999.393. Hygiene and Miscellaneous Supplies.

*Currentness*

(a) Hygiene supplies shall not be considered medical supplies or Durable Medical Equipment (DME) and are not prescribed by health care staff.

   (1) Patients shall request hygiene supplies from custody staff who shall be responsible for distribution of requested supplies.

(b) Mobility, hearing, and vision-impaired disability identification vests are miscellaneous supplies that are included as standard items of DME. Disability identification vests shall be prescribed, purchased, and issued by health care staff.

**Credits**

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code; Armstrong Remedial Plan. *Armstrong* v. *Newsom* (No. C94-2307 CW), U.S. District Court, Northern District of California; and *Plata* v. *Newsom* (No. C01-1351 JST), U.S. District Court, Northern District of California.

HISTORY

1. New section filed 7-1-2019 as an emergency; operative 7-1-2019 (Register 2019, No. 27). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 12-9-2019 or emergency language will be repealed by operation of law on the following day.

2. New section refiled 12-5-2019 as an emergency; operative 12-10-2019 (Register 2019, No. 49). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 3-9-2020 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 3-9-2020 as an emergency; operative 3-10-2020 (Register 2020, No. 11). A Certificate of Compliance must be transmitted to OAL by 6-8-2020 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 3-9-2020 order transmitted to OAL 6-8-2020 and filed 7-20-2020 (Register 2020, No. 30).

This database is current through 2/14/25 Register 2025, No. 7.

Cal. Admin. Code tit. 15, § 3999.393, 15 CA ADC § 3999.393

§ 3999.393. Hygiene and Miscellaneous Supplies., 15 CA ADC § 3999.393

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-018**

§ 3999.394. Comprehensive Accommodation., 15 CA ADC § 3999.394

Barclays California Code of Regulations
Title 15. Crime Prevention and Corrections
Division 3. Adult Institutions, Programs and Parole
Chapter 2. Rules and Regulations of Health Care Services
Subchapter 3. Health Care Operations
Article 9. Durable Medical Equipment/Supplies and Accommodations

15 CCR § 3999.394

§ 3999.394. Comprehensive Accommodation.

Currentness

(a) The Department shall provide medically necessary accommodations to patients to ensure equal access to prison services, programs, and activities.

(b) The following are not medically necessary accommodations and shall not be ordered by health care staff:

(1) Bedding including standard-issued custody mattresses, extra pillows, and blankets.

(2) Housing including single cells, cell housing and dormitory housing, except for control of infectious disease or for mental health reasons as recommended by a Mental Health Interdisciplinary Treatment Team.

(3) Clothing; shoes, including tennis shoes, with the exception of physician-ordered orthotic shoes; specific sizes of clothing; thermal underwear; hats; and long-sleeved shirts.

(4) Shower chairs.

(5) Extra toilet paper.

(c) Patients shall request an accommodation by using the process for requesting health care services or the process for requesting a disability accommodation.

(d) A Primary Care Provider (PCP) may initiate a request for an accommodation based on medical necessity.

(e) Custody or other staff may refer the patient for consideration of an accommodation.

(f) Specialty providers may provide recommendations for an accommodation through consultation reports to be evaluated by the PCP.

**ADD-019**

(g) Accommodations designated as permanent do not require further review or renewal but may be revised or removed by the PCP as indicated by the patient's status.

(h) Temporary accommodations shall remain in force until the documented timeframe has expired.

(i) The accommodation remains valid and in force, if clinically indicated, even if the patient transfers to a different institution.

(j) A copy of the accommodation chrono shall be provided to the patient.

**Credits**

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code; *Armstrong* v. *Newsom* (No. C94-2307 CW), U.S. District Court, Northern District of California; and *Plata* v. *Newsom* (No. C01-1351 JST), U.S. District Court, Northern District of California.

HISTORY

1. New section filed 7-1-2019 as an emergency; operative 7-1-2019 (Register 2019, No. 27). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 12-9-2019 or emergency language will be repealed by operation of law on the following day.

2. New section refiled 12-5-2019 as an emergency; operative 12-10-2019 (Register 2019, No. 49). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 3-9-2020 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 3-9-2020 as an emergency; operative 3-10-2020 (Register 2020, No. 11). A Certificate of Compliance must be transmitted to OAL by 6-8-2020 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 3-9-2020 order transmitted to OAL 6-8-2020 and filed 7-20-2020 (Register 2020, No. 30).

This database is current through 2/14/25 Register 2025, No. 7.

Cal. Admin. Code tit. 15, § 3999.394, 15 CA ADC § 3999.394

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-020**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 24-4756

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

ANSWERING BRIEF

**Signature** | s/ V. Thompson | **Date** | 02/28/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*